IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WESLEY KIMMONS,                                     Case No. 3:21-cv-00768-SB

               Plaintiff,                        **OPINION AND ORDER**

         v.

FIRST TRANSIT, INC., dba THE LIFT,

               Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Plaintiff Wesley Kimmons ("Kimmons") filed this action against his former employer, Defendant First Transit, Inc. ("First Transit"), alleging claims for violations of Title VII of the Civil Rights Act ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and Oregon Revised Statutes ("ORS") chapters 653 and 659A, and wrongful discharge. First Transit moves, pursuant to Federal Rule of Civil Procedure ("Rule") 56, for summary judgment on all claims.

      The Court has original jurisdiction over Kimmons's federal claims pursuant 28 U.S.C. § 1331 and 1343, and supplemental jurisdiction over his related state law claims pursuant to 28

U.S.C. § 1367, and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court grants in part and denies in part First Transit's motion.

## BACKGROUND[1]

Kimmons is an African American man who was born in 1950. (Decl. Wesley Kimmons Supp. Pl.'s Resp. Def.'s Mot. ("Kimmons Decl.") ¶ 2, ECF No. 45; Decl. Daniel Snyder Supp. Pl.'s Resp. Def.'s Mot. ("Snyder Decl.") Ex. E at 1, ECF No. 44.) Kimmons began working for First Transit as a "LIFT" bus operator on February 1, 2010.[2] (Biggs Decl. ¶ 6, Snyder Decl. Exs. A-B.)

## I.    SAFETY REGULATIONS

A LIFT bus operator drives a commercial motor vehicle ("CMV") and, therefore, must comply with the regulations of the Federal Motor Carrier Safety Administration ("FMCSA"), an agency within the U.S. Department of Transportation ("DOT"). (*See* Snyder Decl. Ex. A at 2; *id.* Ex. B at 1; Biggs Decl. Ex. A at 1-6; *id.* Ex. B at 4; Decl. Benjamin Sawyer Supp. Def.'s Mot. Summ. J. ("Sawyer Decl.") Ex. A at 1, ECF No. 33.) Consequently, Kimmons's employment was conditioned on being physically qualified to operate a CMV and pass a DOT physical. (Snyder Decl. Ex. A at 2; *id.* Ex. B at 1; Biggs Decl. Ex. A at 1-6; *id.* Ex. B at 4; Sawyer Decl.

---

[1] Many facts included in this background section are undisputed, but some are not. "Where the evidence is in conflict, [the Court] recount[s] it in the light most favorable to [Kimmons], the non-moving party." *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019) (per curiam).

[2] LIFT is a paratransit service that Tri-County Metropolitan Transportation District of Oregon ("Tri-Met") offers to those "who have a disability that prevents them from using regular, fixed route transportation." (Decl. Lorie Biggs Supp. Def.'s Mot. Summ. J. ("Biggs Decl.") ¶ 2, ECF No. 32; Kimmons Decl. ¶ 7.) Kimmons's first day coincided with when First Transit started handling the LIFT service, pursuant to its contract with Tri-Met. (Biggs Decl. ¶ 6; Snyder Decl. Ex. B at 1.)

Ex. A at 1; Dep. Wesley Kimmons ("Kimmons Dep.") 28:2-30:20, 32:13-35:15, May 11, 2022, ECF No. 30 at 2-74.)

Kimmons's employment records provided that his ability to pass a DOT physical and maintain his physical qualifications were part of his "essential" duties, responsibilities, and job tasks. (Kimmons Dep. 28:2-30:20, 32:13-35:15; Snyder Decl. Ex. B at 1; Sawyer Decl. Ex. A at 1) (bold and all caps omitted). Furthermore, because First Transit's CMV drivers are members of the Amalgamated Transit Union Local 757 (the "union" or "ATU"), Kimmons was subject to a collective bargaining agreement ("CBA"), which listed a driver's "[f]ailure to maintain a valid commercial driver[']s license and current medical certificate" as a "[c]ause[] for immediate discharge[.]" (Biggs Decl. ¶ 4; *id.* Ex. B at 4; *see also* Kimmons Decl. ¶ 15, referring to ATU as "my union").

"Under [DOT] regulations, drivers must get medical examinations from FMCSA-certified examiners every two years[,] . . . [and] cannot operate [a CMV] unless [such] an examiner certifies them as physically qualified to do so." *Parker v. Crete Carrier Corp.*, 839 F.3d 717, 720 (8th Cir. 2016) (citing 49 C.F.R. §§ 391.41(a), 391.43(a), and 391.45(b)); *see also* 49 C.F.R. § 391.43(a), (f) (explaining that the "medical examination must be performed by a medical examiner listed on the National Registry of Certified Medical Examiners," and "results [must] be recorded on the Medical Examination Report Form, MCSA-5875"). "However, if the driver's 'ability to perform his or her normal duties has been impaired by a physical or mental injury or disease,' medical [examination and] certification is again required." *N.L.R.B. v. Pessoa Constr. Co.*, 632 F. App'x 760, 763 (4th Cir. 2015) (brackets omitted) (quoting 49 C.F.R. § 391.45(g)).

///

During the driver's medical examination, also known as a "DOT physical," the FMCSA-certified "examiner measures height and weight; takes a health history; tests vision, hearing, blood pressure, and urine; and physically examines numerous body systems." *Parker*, 839 F.3d at 720 (citing 49 C.F.R. § 391.43). To obtain "certification, a driver must not have impairments that interfere with driving," *id.* (citing 49 C.F.R. § 391.41(b)), such as a "current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." *Pessoa*, 632 F. App'x at 763 (quoting 49 C.F.R. § 391.41(b)(4)); *see also Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 420 (8th Cir. 2016) (explaining that "[d]rivers with certain diagnosed heart . . . conditions that would interfere with the driver's ability to operate a [CMV] are not considered qualified" (citing 49 C.F.R. § 391.41(b))).

## II.   RELEVANT EMPLOYMENT AND MEDICAL HISTORY

Kimmons worked out of First Transit's Nela Street location in northwest Portland. (Sawyer Decl. ¶¶ 1-2; Decl. Thomas Rockstead Supp. Pl.'s Resp. Def.'s Mot. ("Rockstead Decl.") ¶¶ 3-4, ECF No. 47; Kimmons Decl. ¶ 11.) Kimmons reported to Benjamin Sawyer ("Sawyer") and Jackie Moore ("Moore"), who respectively served as the Nela Street location's general manager and assistant general manager. (Sawyer Decl. ¶¶ 1-2; Kimmons Decl. ¶¶ 11, 28.)

### A.   The Bus Incident

Since at least 2017, Kimmons has taken a diuretic or "water pill[]," which causes him to urinate with greater frequency, for edema related to his heart and high blood pressure. (Kimmons Decl. ¶ 15.) That posed a problem for Kimmons because, often times, LIFT drivers transport people who cannot be left alone on the bus due to their disabilities, did not receive morning or

afternoon breaks, and needed to find a public restroom instead of one reserved for Tri-Met drivers. (Decl. Warren Hoeft Supp. Pl.'s Resp. Def.'s Mot. ("Hoeft Decl.") ¶ 6, ECF No. 46; Kimmons Decl. ¶ 14.)

Although Kimmons informed Sawyer of his use of a diuretic and need for scheduled bathroom breaks, Sawyer "told [Kimmons] that [First Transit] could not and would not schedule bathroom breaks for [him]." (Kimmons Decl. ¶ 15.) About a year later, in or around September 2018, Kimmons urinated into a can when he was on his unoccupied LIFT bus because he had not received a bathroom break and "urgently" needed to use the restroom given his use of a diuretic medication. (*Id.*; Hoeft Decl. ¶ 20; Snyder Decl. Ex. M.) First Transit discovered that Kimmons had done so when it was looking into an unrelated employment matter and reviewing video footage from the inside of Kimmons's bus.[3] (Dep. Benjamin Sawyer ("Sawyer Dep.") 61:13-19, May 10, 2022.)

Sawyer discussed the footage with Kimmons and Kimmons's union shop steward, Warren Hoeft ("Hoeft"). (Kimmons Decl. ¶ 15; Hoeft Decl. ¶¶ 6, 15, 20; Sawyer Dep. 60:21-62:5.) Sawyer warned Kimmons that a repeat incident would result in his termination, but he did not impose any discipline because "First Transit had an agreement with the union not to fish for disciplinary violations," such as the "nonserious" violation that Kimmons committed and First Transit "discovered while looking for other issues." (Hoeft Decl. ¶ 20; Kimmons Decl. ¶ 15; Sawyer Dep. 62:12-64:2; Decl. Robert Christiansen Supp. Pl.'s Resp. Def.'s Mot. ("Christiansen

---

[3] Excerpts of Sawyer's deposition testimony in this case can be found in three places on the docket. (*See* Decl. Joseph Ridgeway Supp. Def.'s Mot. Summ. J. ("Ridgeway Decl.") Ex. B at 1-55, ECF No. 30 at 75-129; Decl. Megan Crowhurst Supp. Def.'s Reply ("Crowhurst Decl.") Ex. 3 at 2-3, ECF No. 54; Snyder Decl. ¶ 27, attaching an unenumerated exhibit, ECF No. 44 at 96-130). The docket also includes excerpts of Sawyer's deposition testimony in a different employee's case, which, as discussed below, is relevant in some respects to Kimmons's claims. (*See* Decl. Daniel Snyder Supp. Pl.'s Surresponse ("Second Snyder Decl.") Ex. A at 1-13, ECF No. 57 at 3-15.)

Decl.") ¶ 17, ECF No. 58.) Sawyer did not create or place any record about the incident or his warning in Kimmons's file, nor was he aware of anyone doing so. (Sawyer Dep. 60:21-63:4.) Hoeft, who had previously seen Kimmons's file, also stated that "there was no discipline or letter of warning in the disciplinary file over urinating into a container or can on a bus." (Hoeft Decl. ¶¶ 18, 20.)

## B.    Pneumonia and Gout-Related Medical Leave

About four months later, in late December 2018, Kimmons contracted pneumonia and therefore requested and received medical leave. (Kimmons Decl. ¶ 16; Sawyer Dep. 64:20-65:10.) Kimmons's primary care physician, Maung Myint, M.D. ("Dr. Myint"), completed a work status report reflecting that he placed Kimmons off work from December 31, 2018 through January 7, 2019 and deemed Kimmons able to return on January 8, 2019. (Snyder Decl. Ex. C.) Kimmons also requested and received approval for intermittent medical leave between January 1 and March 30, 2019, pursuant to the medical certification form that Dr. Myint submitted regarding Kimmons's inability to work during gout flare-ups. (Sawyer Dep. 65:11-66:5; Snyder Decl. Ex. D.)

## C.    Deposition Subpoenas and Testimony

In April 2019, Kimmons's former co-worker, Robert Christiansen ("Christiansen"), subpoenaed Kimmons to appear for a deposition scheduled later that month. (Kimmons Decl. ¶ 17.) Kimmons did not appear for his April 2019 deposition because he was "afraid [he] would be fired if [he] gave deposition testimony critical of how First Transit treated people with disabilities." (*Id.* ¶ 18.) That same month, Sawyer appeared and testified at a deposition in Christiansen's case. (Second Snyder Decl. Ex. A at 1; Sawyer Dep. 5:8-10, 7:7-18, 10:2-5, 63:5-17, 79:6-11.)

///

Similar to Kimmons's recent bathroom-related incident on his bus, Christiansen's case against First Transit concerned his chronic medical condition involving bladder incontinence and a "lack of sensation warning [him] that [he] needs to urinate," Sawyer and Moore's handling of LIFT drivers' bathroom breaks, and First Transit's decision to terminate Christiansen after a passing motorist purportedly witnessed him standing inside his bus and urinating into a bottle. (Christiansen Decl. ¶¶ 5-16.) Christiansen maintained that he concealed himself in a bus alcove, his actions were consistent with past training and a last resort stemming from his need to "wear[] Depends or other adult diapers," which "were full," to cope with his medical condition and the "unavailability of bathrooms during [his] route," and that Sawyer was "dismissive and abusive" when he submitted a post-incident letter from his medical provider confirming his condition. (*Id.* ¶¶ 8, 11-14.)

On July 8, 2019, after receiving a second subpoena and an order to appear from a judge from this district and discussing his fear of retaliation with Sawyer, Kimmons testified at a deposition in Christiansen's case. (Kimmons Decl. ¶¶ 18-20.) Kimmons, who was sick at the time and had been "cutting back on diuretics as . . . Sawyer had suggested because [he] had trouble holding [his] urine due to the lack of breaks," testified about his experience working for First Transit and with urinary urgency due to a medical condition, and how First Transit did not discipline him for engaging in conduct equivalent to Christiansen's bus incident. (*Id.* ¶ 20.) Kimmons also testified that Moore told him that she discovered the footage of his incident while she was "investigating an unrelated customer complaint," and he would "not [be] disciplined." (*Id.*)

Sawyer gave his deposition before Kimmons and before telling Kimmons that he should "tell the truth" during his deposition, Sawyer knew that Kimmons received a subpoena, First

Transit adjusted Kimmons's schedule "so that he could appear for [his] deposition," and
Kimmons did not want to testify or know "what he should do." (Sawyer Decl. ¶ 4; Kimmons
Decl. ¶¶ 19-20.) Nevertheless, Sawyer recently testified that he did not know if Kimmons gave a
deposition in Christiansen's case:

> Q.     Was . . . Kimmons a witness in a civil rights case filed by . . . Christiansen
>        against First Transit?
>
> A.     A witness for the --
>
> Q.     A witness, period.
>
> A      -- opposing side?
>
> Q.     A witness, period.
>
> A.     I don't believe he witnessed the event, no.
>
> Q.     Did he give a deposition in that lawsuit?
>
> A.     I don't know.
>
> Q.     And you and . . . Moore both gave depositions in that lawsuit, correct?
>
> A.     I did, yes.
>
>        . . . .
>
> Q.     Did you take any action against [Kimmons] because he testified in
>        [Christiansen's] case . . . ?
>
> A.     No. But can I add that I didn't even know that he actually testified or that
>        that was -- I mean, it never went to court; so how do you testify, right?

(Sawyer Dep. 63:5-17, 79:6-11; *see also id.* 7:22-25, noting Sawyer's past experience testifying
"before a judge and jury").

    Sawyer recently attempted to clarify that when he testified he did not "even know that
[Kimmons] actually testified" in Christiansen's case, he understood the question First Transit's
counsel posed to "mean whether . . . Kimmons testified in court during trial, not in a deposition."
(Sawyer Decl. ¶ 4; Sawyer Dep. 79:6-15.) Sawyer, however, did not attempt to clarify or further

address his testimony that he did not know if Kimmons gave a deposition. (*See* Sawyer Decl. ¶ 4, demonstrating as much and stating that "[n]o one at First Transit took any adverse action against . . . Kimmons or treated him differently because of his [deposition] testimony").

### D.    Heart-Related Medical Visits, Examinations, and Leave

On July 11, 2019, three days after he gave a deposition in Christiansen's case, Kimmons visited the emergency room because he continued to feel sick. (Kimmons Decl. ¶ 22; Kimmons Dep. 35:16-25; 38:5-24; Ridgeway Decl. Ex. A at 43-50.) Kimmons felt like he had the flu (and in hindsight, speculated that he may have contracted COVID-19 before the public knew of its existence) because he got "sick while eating in a restaurant," was "shaking and sweating," could not "lay flat without becoming severely [short of breath]," and had diarrhea, "bilateral leg swelling[,] and abdominal bloating." (Kimmons Decl. ¶ 22; Kimmons Dep. 99:5-25, Ridgeway Decl. Ex. A at 43.)

During his emergency room visit, Kimmons admitted "poor compliance" with his diuretic medication (hydrochlorothiazide or "HCTZ") and an increased intake of "salty foods recently."[4] (Ridgeway Decl. Ex. A at 43, 45, 47.) The emergency room provider, Rebecah Wilks, M.D. ("Dr. Wilks"), examined Kimmons and reviewed the results from Kimmons's lab work, imaging, and electrocardiogram ("EKG"). (*Id.* Ex. A at 43-45.) Dr. Wilks noted that Kimmons's EKG revealed what "appear[ed]" to be a "new" and "mild" finding when compared to past results, Kimmons's imaging demonstrated "[v]ascular congestion with small effusions" and an enlarged heart, and the radiologist could not "exclude developing failure." (*Id.* Ex. A at 45.) In light of Kimmons's "recent noncompliance" with HCTZ and "marked improvement" after intravenous treatment with a diuretic medication (Lasix), Dr. Wilks "suspect[ed] fluid overload" and stated

---

[4] HCTZ is "a diuretic/blood pressure medicine." *Duncan v. Corr. Med. Servs.*, 451 F. App'x 901, 902 (11th Cir. 2012).

that Kimmons's "[h]istory [was] most suggestive" of congestive heart failure ("CHF").[5] (*Id.*)

Dr. Wilks added that her final impression was CHF and she advised Kimmons to continue taking

a diuretic medication (Lasix) and potassium chloride supplement, eat a low salt diet, follow up

with his primary care provider the next week, and present for an outpatient EKG and evaluation.

(*Id.* Ex. A at 45-47.)

      After his emergency room visit and discussions with Dr. Wilks, Kimmons knew that

Dr. Wilks "suspected" that he had CHF, but he also believed that Dr. Wilks felt that his issues

were due to water retention caused by diuretic medication noncompliance and thus any

"congestive heart trouble" was not permanent, could be "overcome," and would "go away" and

"return[] to normal" if he "started taking the diuretics again." (Kimmons Decl. ¶ 22; Kimmons

Dep. 38:25-39:17.)

      Kimmons presented for a follow-up transthoracic EKG on August 14, 2019. (Ridgeway

Decl. Ex. A at 51.) Kimmons's EKG revealed "borderline dilation of the ascending aorta" and

several "mild" findings, including a "mild[] decrease" in the "left ventricular systolic function"

with a visually estimated ejection fraction ("EF") of "40-45%," and was indicative of CHF.[6] (*Id.*

Ex. A at 52.)

///

---

    [5] "Lasix, or Furosemide, is a diuretic (water pill) used to treat high blood
pressure . . . [and] swelling due to fluid retention associated with heart failure or kidney or liver
disease." *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 476 n.9 (4th Cir. 2010)
(simplified).

    [6] "The left ventricular [EF] measures 'the fraction of chamber volume ejected in
systole'—that is, the emptying phase of the heartbeat—'in relation to the volume of the blood in
the ventricle at the end of diastole'—that is, the dilating and filling phase; a left ventricular [EF]
of 41 percent to [51 or] 53 percent is 'mildly abnormal' in a [man and] woman[, respectively]."
*Darlene M. v. Kijakazi*, No. 20-cv-01817, 2021 WL 6841641, at *7 n.13 (D.D.C. Sept. 3, 2021)
(quoting Ateet Kosajaru, Amandeep Goyal, Yulia Grigorova, & Amgad N. Makaryus, *Left
Ventricular Ejection Fraction*, https://perma.cc/7W5Y-NUSJ (last updated Apr. 24, 2023)).

On August 28, 2019, Kimmons underwent a myocardial perfusion imaging nuclear stress test. (*See* Ridgeway Decl. Ex. A at 57, 60; *id.* Ex. H at 3.) Kimmons's nuclear stress test revealed "no fixed or reversible perfusion defects to suggest myocardial scar or ischemia," and "decreased left ventricular wall motion and thickening with a calculated [EF] of 34%." (*Id.* Ex. A at 57.)

On September 3, 2019, Kimmons visited his primary care physician, Dr. Myint, and requested and received medical leave from September 3 to September 25, 2019 "due to his heart condition and EKG changes." (*See* Ridgeway Decl. Ex. A at 55-56, noting the encounter date and Dr. Myint subsequently cited Kimmons's "heart condition and EKG changes" as the basis for being "taken off" work; *id.* Ex. B at 50, reflecting that Sawyer documented in an email that "Kimmons contacted [his] office and requested [and received] a medical leave of absence due to a heart issue" on September 3, 2019; *see also* Sawyer Dep. 22:1-23:6, reflecting that Sawyer did not recall or rule out that he talked to Kimmons on September 3, 2019, and assumed First Transit approved the request; Kimmons Dep. 43:2-44:25, 46:1-11, reflecting that Kimmons could not recall and did not know Dr. Myint's reason for taking him off work and noted that he had pneumonia again, but later acknowledged Dr. Myint's statement that he was taken off due to his heart condition; *but cf.* Kimmons Decl. ¶ 24, stating that the September 2019 leave was "for pneumonia").

Kimmons returned to work "[o]n or about September 25, 2019," and drove a LIFT bus on his "regular route the whole shift." (Kimmons Decl. ¶ 26; *but cf.* Ridgeway Decl. Ex. A at 56, reflecting that after 3:00 p.m. on September 25, 2019, Dr. Myint stated that Kimmons "is off work," "would like to go back to work for one year," and had an appointment with a "cardiologist next week"; *id.* Ex. B at 48, demonstrating that in early October 2019, Moore informed a medical clinic that Kimmons had "been off work" since September 3, 2019 due to

CHF; Sawyer Dep. 23:7-12, showing that Sawyer did not recall that Kimmons returned to work between September 3, 2019 and December 2019; Biggs Decl. Ex. D at 1, noting that Kimmons did not have any floating holidays or use sick or vacation time in September or the remainder of 2019).

The next day, September 26, 2019, Kimmons presented for an evaluation with a nurse on the team of a cardiologist, Katherine Strelich, M.D. ("Dr. Strelich"), who had an upcoming appointment with, and planned to personally evaluate, Kimmons on October 4, 2019.[7] (Kimmons Decl. ¶ 27; Ridgeway Decl. Ex. A at 56.) The nurse informed Kimmons that Dr. Strelich "wanted [him] to stay off work for a week until she could familiarize herself with [his] chart and fully evaluate [him]." (Kimmons Decl. ¶ 27.) Based on these instructions, Kimmons "called First Transit and told them that [he] would be off work [until he] saw Dr. Strelich" on October 4, 2019. (*Id.*)

On October 4, 2019, Dr. Strelich evaluated Kimmons and completed a report regarding his ability to "return to his normal activities working as a bus driver." (Ridgeway Decl. Ex. A at 57-58.) Dr. Strelich noted that Kimmons presented with a "new diagnosis of probable nonischemic cardiomyopathy [and CHF] related to hypertension," Kimmons's stress test showed "decreased left ventricular wall motion and thickening with a calculated [EF] of 34%," Kimmons had "class [II] symptoms," Kimmons would adjust his medications and continue his "current dose of diuretic," she referred Kimmons to her "CHF case management team," and Kimmons's EKG "EF [was] greater than 40% which is what has [previously] been required to maintain"

---

[7] The record does not appear to include a copy of Kimmons's September 26, 2019 treatment note.

Kimmons's commercial driver's license ("CDL").[8] (*Id.*) Based on her evaluation and findings, Dr. Strelich cleared Kimmons to return to work as a bus driver without restrictions on October 9, 2019, noting that Kimmons's "current cardiac situation would not prohibit a continued CDL." (*Id.* Ex. A at 58.)

That same day, October 4, 2019, Kimmons visited his work and provided Moore with a copy of Dr. Strelich's clearance to return to work. (Kimmons Decl. ¶ 28.) After his appointment with Dr. Strelich, Kimmons complied with Dr. Strelich's recommendations regarding his medications and he "felt a lot better," his "legs stopped swelling," and he "assumed that [he] was recovering from whatever was causing [him] to retain water and that [he] was good to return to work." (*Id.* ¶ 29.)

On October 8, 2019, Moore called to inform Kimmons that he should not report to work the next day, he was "not permitted to return . . . until [he] saw First Transit's own doctor," and he needed to present for an appointment at Providence Occupational Medicine ("Providence") on October 10, 2019. (*Id.* ¶ 30.) Moore did not explain why Kimmons needed to visit First Transit's doctor, or refer to the appointment as a fitness-for-duty examination. (*Id.*; *see also* Sawyer Dep. 41:16-43:25, noting that Sawyer told Kimmons that he needed to go to the appointment and "the

---

[8] Cardiomyopathy can cause CHF. *See McDonald v. U.S. Postal Serv.*, No. 19-cv-08303, 2022 WL 194534, at *3 (D. Ariz. Jan. 21, 2022) (observing that "cardiomyopathy . . . [can be] the cause of [a person's] clinical [CHF]") (simplified); *Costa v. Ryder Truck Rental, Inc.*, No. 1:17-cv-03568, 2019 WL 13268205, *2 n.5 (N.D. Ga. Jan. 28, 2019) (recognizing that "cardiomyopathy means [the] heart muscles are too thick, which in turn causes [CHF]," i.e., "the failure of the heart to pump blood through the body as strongly as it should," resulting in "insufficient blood flow to parts of [the] body and the occasional buildup of fluid") (citations omitted). The New York Heart Association ("NYHA") Functional Classification "use[s] a scale of I to IV," *Adair v. Saul*, 816 F. App'x 26, 27-28 (8th Cir. 2020), and "[c]lass II denotes a slight limitation of physical activity from [CHF] symptoms such as fatigue, palpitation, or shortness of breath." *Panchali Tusti Huynk v. Berryhill*, No. 16-cv-01642, 2017 WL 3090258, at *4 (C.D. Cal. July 20, 2017).

chances are very good" that Kimmons provided Sawyer with a copy of Dr. Strelich's clearance form).

Around the time she called Kimmons, Moore sent a letter to an unnamed "[d]octor" at Providence stating, among other things, that Kimmons, a "[p]aratransit driver for Tri-Met LIFT," needed a fitness-for-duty evaluation because he had been off work since September 3, 2019 due to CHF and hypertension, and his "physician" released him to return to work on October 9, 2019. (Ridgeway Decl. Ex. B at 48.) Moore added that First Transit's "concern[]" was whether Kimmons could "perform all the essential duties of [his] job safely, without injury to himself or his passengers, as outlined on [an attached] Job Analysis Form[.]" (*Id.*) Moore also noted that she attached "a copy of [Kimmons's] specific job duties" and Kimmons's "physician release form." (*Id.*; *see also* Sawyer Decl. Ex. A at 1-4, attaching a copy of the Job Analysis Form for LIFT drivers).

On October 10, 2019, Kimmons presented for his appointment at Providence. (Ridgeway Decl. Ex. A at 59-62; Kimmons Decl. ¶¶ 32-34.) The front desk asked Kimmons to fill out various forms, including a "DOT long form."[9] (Kimmons Decl. ¶ 32; Dep. Andrew Singh ("Singh Dep.") 23:18-26:1, Aug. 18, 2022, ECF No. 30.)[10] Kimmons, who was accompanied by his long-time "life partner," Donna Fraser ("Fraser"), informed Providence's front desk and medical assistant that he had "trouble reading the forms because [he] did not have [his] glasses." (Kimmons Decl. ¶ 32; Decl. Donna Fraser Supp. Pl.'s Resp. Def.'s Mot. ("Fraser Decl.") ¶¶ 3-4.

_____

[9] A DOT long form is the "medical examination report form" that is part of a DOT physical. (*See* Sawyer Dep. 56:12-16, so stating; Ridgeway Decl. Ex. A at 63-66, providing a complete example; *id.* Ex. D at 1-3, providing Kimmons's October 10, 2019 partially completed form).

[10] Excerpts of Andrew Singh, M.D.'s ("Dr. Singh") deposition testimony can be found in two places on the Court's docket. (*See* Ridgeway Decl. Ex. C at 1-36, ECF No. 30 at 130-65; Snyder Decl. ¶ 28, attaching an enunmerated exhibit, ECF No. 44 at 131-62).

ECF No. 48.) After Kimmons provided the urine sample the medical assistant requested, Dr. Singh arrived and asked Kimmons to "run up and down flights of stairs without holding onto the handrail."[11] (Kimmons Decl. ¶ 36.)

After he did so, Dr. Singh informed Kimmons that he was "out of shape" but did not discuss Kimmons's medication regimen, conduct a typical DOT physical, or test Kimmons's blood pressure or pulse. (*See id.* ¶¶ 34-37.) Dr. Singh also informed Kimmons that he had spoken to First Transit, First Transit did "not want [Kimmons] back," and he was "not releasing [Kimmons] to return to work." (*Id.* ¶ 37.) Dr. Singh, however, never explained that Kimmons could not return to work due to his NYHA classification or EF. (*Id.*) Nor did Dr. Singh explain that he was "cancelling or revoking [Kimmons's] CDL or putting [Kimmons] on a list of drivers not eligible to drive[, or] . . . that [Kimmons's urine sample] potentially indicate[d] kidney troubles." (*Id.*)

Shortly thereafter, Kimmons told Fraser that Dr. Singh did not examine him. (Fraser Decl. ¶ 7.) Dr. Singh also sent First Transit a one-page letter titled "Fit for Duty Evaluations," stating, among other things, that he determined that Kimmons did not meet the criteria for DOT medical clearance and was not medically cleared to drive a CMV, and as a consequence, Kimmons could not perform the essential functions of his LIFT driver position.[12] (Ridgeway Decl. Ex. B at 49.)

---

[11] Dr. Singh received his board certification in occupational medicine in 2005, and his license to practice medicine in Oregon during the "summer of 2018," but "there was a stipulation on his [Oregon] license that [he] needed to have a mentor" because he had taken "a leave of absence in Florida" and not practiced medicine for "approximately two years." (Singh Dep. 12:6-13:15.)

[12] On October 13, 2019, Dr. Singh "[f]iled" and "signed" a clinical note regarding Kimmons and an encounter date of October 10, 2019. (Ridgeway Decl. Ex. A at 59-61.) Unlike a subsequent clinical note discussed below, this clinical note's "[s]tatus" is listed as "[a]ddendum" and also references an incorrect "[d]ate of exam" of "10/12/2019." (*Compare id.*, *with id.* Ex. A

PAGE 15 – OPINION AND ORDER

Dr. Singh could not recall what he specifically told Moore and First Transit about the permanency of Kimmons's condition and work status, but stated that he "would have told [Moore] something on the order that [Kimmons's] condition could improve[,] and [Kimmons] could meet [the] criteria in the future to be certified for a DOT medical card." (Singh Dep. 43:2-25, 45:1-6.) Dr. Singh's letter, however, stated nothing to that effect. (*See* Ridgeway Decl. Ex. B at 49.)

Singh also acknowledged that (1) Kimmons's October 10, 2019 appointment was a fit-for-duty examination, not a DOT medical certification examination, (2) he did not complete the medical examiner's portion of the DOT long form and thus did not complete the steps necessary for a DOT medical certification examination, (3) asking a patient to run or walk up and down a flight of stairs is not "a standard part of the [DOT medical] examination," or the way that Dr. Singh typically "assess[es] the status of [a patient's] cardiovascular tolerance," (4) a physician can derive an EF percentage from an EKG or nuclear stress test, (5) an EF "greater than 40 percent is [one of the components] required to maintain a CDL license," (6) Dr. Strelich relied on Kimmons's August 14, 2019 EKG, which showed an EF of "40 to 45 percent," when she released him to work, and (7) although he believed Dr. Strelich, who issued her opinion less than a week earlier, knew more about Kimmons's cardiac condition because she was a treating cardiologist and stated that Dr. Strelich's treatment records were "integral to [his] conclusions," he nevertheless relied on Kimmons's nuclear stress test EF of "34 percent." (Singh Dep. 20:6-11, 21:15-22:16, 30:14-32:10, 35:8-10, 37:4-38:4, 38:25-41:25, 45:22-46:2, 51:1-7; Ridgeway Decl. Ex. A at 61.)

///

at 67-68.) As noted below, Kimmons complained about Dr. Singh's conduct before October 13, 2019.

Later that same day, October 10, 2019, Kimmons visited First Transit's office and informed Moore and Sawyer that Dr. Singh did not examine him, he did not believe that Dr. Singh's treatment was "fair," and he wanted a "second examination." (Kimmons Decl. ¶ 38; *see also* Sawyer Dep. 27:8-19, confirming that Sawyer spoke to Kimmons on October 10, 2019, but could not recall if First Transit had already received Dr. Singh's one-page letter). Although Moore refused Kimmons's request and stated that Kimmons was "finished," Sawyer stated otherwise, informed Kimmons that he "could have a second examination by another doctor," and asked Moore to schedule a second appointment. (*Id.*; *see also* Sawyer Dep. 27:20-23, 49:13-18, 69:1-6, noting that LIFT drivers are typically entitled to "go anywhere they want . . . for a DOT [recertification] exam," and Sawyer did not refuse Kimmons's request for a second opinion and never stated or implied that if "Providence failed to give [Kimmons] a DOT certification[, Kimmons] was precluded from going to another doctor and going through another DOT exam").

Kimmons did not hear from First Transit over the next seven weeks. (Kimmons Decl. ¶ 39.) During that time, Kimmons, who was "not getting paid," began an exercise program (jogging and going to a gym) with the "intention to improve [his] physical stamina and fitness." (*Id.*)

In or around late November 2019, Kimmons received a call from Moore regarding his second appointment. (*Id.* ¶¶ 39-40.) Moore instructed Kimmons to visit Providence on December 3, 2019. (*Id.* ¶ 40.)

On December 3, 2019, Kimmons visited Providence, filled out paperwork and a DOT long form, and waited in an examination room. (*Id.* ¶ 41; Ridgeway Decl. Ex. A at 63-64.) On the DOT long form, Kimmons indicated that he was "[n]ot [s]ure" if he currently has or ever had "[h]eart disease, heart attack, bypass, or other heart problems." (Ridgeway Decl. Ex. A at 64)

(bold omitted). During his first Providence visit, Kimmons had answered "[n]o" to this question. (*Id.* Ex. D at 2.) At both visits, however, Kimmons confirmed that he had high blood pressure. (*Id.*; *id.* Ex. A at 64; *cf. id.* Ex. A at 57, diagnosing cardiomyopathy and CHF, which were "related to hypertension").

Contrary to Kimmons's expectation, Dr. Singh walked into Kimmons's examination room and asked "why [Kimmons was] [t]here[.]" (Kimmons Decl. ¶¶ 40-41.) After Kimmons explained why he returned to Providence and how Dr. Singh previously failed to examine him and that he had been exercising, dieting, and taking his medications as prescribed, Dr. Singh told Kimmons that "he did not need to examine [him]." (*Id.* ¶ 41.) When Kimmons voiced his opposition, Dr. Singh placed "two fingers on [Kimmons's] left ankle and said '[t]here[,] I examined you.'" (*Id.*) Although Kimmons emphasized that he was not receiving fair treatment, Dr. Singh stated that Kimmons was "still not released to return to work" and should "talk to First Transit[,]" not Dr. Singh, because First Transit was "the one[] refusing to let [Kimmons] return to work." (*Id.*)

Dr. Singh initially acknowledged that his December 3, 2019 physical examination "would have been extremely cursory" (i.e., he "would not have listened to [Kimmons's] heart and [he] would not have listened to [Kimmons's] lungs"), he "did not [perform] a thorough examination," Kimmons did not run up and down stairs, Dr. Singh did not ask to reevaluate Kimmons, and he did not recall or know who asked for the reevaluation, whether he charged First Transit for a reevaluation, or whether Kimmons informed him that First Transit sent him back for another examination. (Singh Dep. 46:4-48:19.) Dr. Singh explained that he would have conducted an "extremely cursory" physical examination because Kimmons's records noted worsening CHF (a nurse noted class III, as opposed to class II, CHF on the NYHA scale), which,

in his "medical opinion," precluded Kimmons from driving a CMV and meant that even if Kimmons had "a pristine physical exam, it would not have changed [his] decision-making." (*Id.* 46:8-24, 48:16-22; *see also id.* 53:4-54:9; Snyder Decl. Ex. I, noting Dr. Singh's primary reliance on the DOT "recommendation" that drivers need an EF "greater than 40%" and "no worse than class I" CHF).

When pressed for an answer on whether he actually examined "any part of [Kimmons's] body," Dr. Singh stated that he would have seen the skin of Kimmons's face: "I w[ould] have seen the skin of his face, but I did not do a thorough exam and I did not document a thorough exam." (Singh Dep. 48:23-49:4.) After a moment of reflection, Dr. Singh asked to "clarify this a little bit" and "apologize[d] for [his] misstatement [he] was reading -- or telling you." (*Id.* 49:5-10.) Dr. Singh then stated that his DOT long form showed that he conducted a physical exam of Kimmons on December 3, 2019, just "not a very thorough physical exam at all." (*Id.* 49:11-15.) Dr. Singh added that based on the DOT long form, he "would have gone through all 14 systems" and did not recall that he simply "touched [Kimmons] and said, there, I examined you[.]" (*Id.* 49:16-24.) Dr. Singh also denied that First Transit ever told him not to release Kimmons. (*Id.* 52:23-53:3.)

Following his appointment, Kimmons spoke with one of his union representatives about Dr. Singh's failure to examine him and statement that First Transit "did not want [him] back at work." (Kimmons Decl. ¶ 42.) The union representative advised Kimmons to schedule a DOT examination at a different occupational medicine clinic, First In Health, Inc. ("FIH"), before his DOT medical certification expired on December 31, 2019. (*Id.*; Kimmons Dep. 96:9-12, 127:1-3.) Based on this advice and the fact that First Transit had previously sent CMV drivers to FIH, Kimmons told Sawyer that he "planned to go to an independent DOT examiner to get an

opinion," and Sawyer did not object to the plan and stated that he would provide any second opinion to Dr. Singh. (Kimmons Decl. ¶ 42; Kimmons Dep. 96:9-12, 127:4-21; Sawyer Dep. 27:20-28:5.)

On December 13, 2019, Kimmons presented for an examination with Lisa DeCapua, N.D. ("Dr. DeCapua"), at FIH. (Kimmons Decl. ¶ 43; Ridgeway Decl. Ex. A at 69-73.) Kimmons once again filled out a DOT long form. (Ridgeway Decl. Ex. A at 70-71.) Unlike the DOT long form he completed for Dr. Singh on December 3, 2019 (*see id.* Ex A at 64)—but like the DOT long form he completed for Dr. Singh on October 10, 2019 (*see id.* Ex. D at 2)— Kimmons answered "[n]o" regarding whether he currently has or ever had "[h]eart disease, heart attack, bypass, or other heart problems." (*Id.* Ex. A at 71) (bold omitted). In a comment section regarding any of his "yes" answers, however, Kimmons noted that he had a "co[ng]ested heart" and began taking "water pills" because he was "retaining to[o] much water." (*Id.*; Kimmons Dep. 105:1-2.) Kimmons also told Dr. DeCapua about his "heart history," including Drs. Myint and Strelich's treatment, Dr. Strelich's October 9, 2019 clearance, and how First Transit's doctor, Dr. Singh, "twice refused to allow [him] to return to work." (Kimmons Decl. ¶ 43; Kimmons Dep. 103:1-2.)

Dr. DeCapua reviewed Kimmons's health history and any available medical records and examined Kimmons. (Ridgeway Decl. Ex. A at 70-73.) Based on this information, Dr. DeCapua certified that she was familiar with, and Kimmons satisfied, the FMCSA's safety regulations. (*Id.*) Dr. DeCapua thus issued Kimmons a DOT medical card with an expiration of December 13, 2020. (*Id.*; *see also* Sawyer Dep. 55:24-56:16, explaining that the DOT medical examiner's certificate, which is part of the examiner's records and precedes the DOT long form, is the "same

thing as what people call the DOT [medical] card," even though it is not "a photograph of [the] actual card").

Dr. DeCapua's records suggest that she referenced Kimmons's primary care physician at Kaiser, Dr. Myint. (*See* Ridgeway Decl. Ex. A at 71, referencing a "Dr. Mitts" at "Kaiser"). Dr. DeCapua's records also suggest that she referenced "HCTZ," a diuretic, at least once. (*See id.* at 70-73, listing "HCTZ" as a current medication in the medical examiner and driver's portions in what appears to be similar handwriting, which seems to differ from most of the driver's section handwriting).

The HCTZ reference is potentially notable with respect to what medical records Dr. DeCapua reviewed because given Kimmons's "marked" emergency room response to intravenous Lasix (also known as Furosemide) on July 11, 2019, Dr. Wilks instructed Kimmons to take Lasix daily "instead of" HCTZ. (*Id.* Ex. A at 45-47.) It does not appear that Dr. Strelich switched Kimmons back to HCTZ during the relevant time period. (*See id.* Ex. A at 57, noting that on October 4, 2019, Dr. Strelich advised Kimmons to "[c]ontinue his current dose of diuretic"; *id.* Ex. H at 1-4, reflecting that on October 25, 2019, Dr. Strelich's CHF case management team referred to "Furosemide" as Kimmons's "[d]iuretic," stated that Kimmons was switching from Furosemide to "torsemide" and planned to "purchas[e] [torsemide] th[at] weekend," and listed "Torsemide," but not Furosemide or HCTZ, among Kimmons's "[c]urrent [o]utpatient [m]edications").[13]

At the same time, it appears that Kimmons attempted to list torsemide among his current medications, and that Dr. DeCapua referenced a hemoglobin A1C test result of "6.0," which, at

---

[13] Like Furosemide, "[t]orsemide is also used to treat edema and is in the same class as diuretics." *Hubbert v. Kijakazi*, No. 1:22-cv-00014, 2023 WL 346023, at *5 n.2 & n.3 (E.D. Mo. Jan. 20, 2023).

least in the record before the Court, came from a clinical note that Dr. Singh filed and signed on October 13, 2019, detailing Kimmons's CHF. (*See id.* Ex. A at 70-71, listing "Tsmite" and "Torsemite" in the driver's section; *id.* Ex. A at 59-61, noting that Kimmons's "HgA1C last year was 11.5, but since being on insulin his HgA1[C] in Aug[ust] 2019 is 6.0," and "the DOT medical recommendation that a driver with [CHF] be no worse than a class I [on the NYHA scale] and must have an EF of greater than 40%[, and how Kimmons] does not meet [both] criteria").

Immediately after his appointment, Kimmons provided his union shop steward, Hoeft, with a copy of Dr. DeCapua's medical certification and records. (Kimmons Decl. ¶ 45.) He also provided a copy to Sawyer, who represented that he would follow up after speaking to Dr. Singh. (*Id.*)

E.    **Employment Meetings, Decisions, and Discussions**

Four weeks later, on January 10, 2020, Kimmons and Hoeft presented for a meeting with Sawyer at First Transit's office. (*Id.* ¶ 46; Hoeft Decl. ¶ 13.) During the meeting, Sawyer confirmed that he was going to provide Dr. Singh with Dr. DeCapua's certification and records and follow up in a few days regarding Kimmons's ability to return to work. (Kimmons Decl. ¶ 46.) Sawyer, who previously worked as a sheriff's deputy, also warned Kimmons that if he discovered that Kimmons failed to inform Dr. DeCapua about his CHF, he would have Kimmons "criminally prosecuted to the full extent of the law." (*Id.*; Sawyer Dep. 7:19-21; *see also* Kimmons Dep. 115:3-6, noting that Sawyer told Kimmons "he'd have him prosecuted [to] the full extent of the law"). Kimmons responded that he told Dr. DeCapua about his CHF. (Kimmons Decl. ¶ 46.)

///

///

Later that day, Moore "offered to let [Hoeft] go through First Transit's medical file or folder regarding . . . Kimmons . . . without Kimmons'[s] knowledge or [a] release[.]"[14] (Hoeft Decl. ¶ 14.) The next day, January 11, 2020, Hoeft filed a grievance on Kimmons's behalf. (Hoeft Decl. ¶ 15.)

At some point between January 16 and January 23, 2020, Sawyer claims that Dr. Singh, who Sawyer purportedly "spoke to several times," called to discuss his review of and opinion regarding Dr. DeCapua's DOT medical certification. (Sawyer Dep. 19:16-23, 29:5-21, 38:6-18; Ridgeway Decl. Ex. B at 50-51; Kimmons Decl. ¶ 47.) According to Sawyer, Dr. Singh stated that he spoke to Dr. DeCapua, Kimmons's CHF was "a permanent disqualifier for a CDL holder," and Kimmons "falsely completed" the DOT long form he provided to Dr. DeCapua. (Sawyer Dep. 19:16-23, 29:5-21, 38:6-18; Ridgeway Decl. Ex. B at 50-51.) Sawyer added that he did not know and could not say if Dr. Singh "actually did" talk to Dr. DeCapua. (Sawyer Dep. 19:16-23.)

Dr. Singh, however, testified that he did not know Dr. DeCapua and never communicated with Drs. DeCapua, Strelich, or Myint, let alone in regard to Kimmons's medical status. (Singh Dep. 34:1-35:7.) Dr. Singh's October 10, 2019 letter to First Transit did not state as much (*see* Ridgeway Decl. Ex. B at 49), but Dr. Singh also testified that on or around the day of Kimmons's October 10, 2019 visit and several months before January 2020, he "would have told

---

[14] Moore's involvement in the decision whether to allow Kimmons to return to work troubled Kimmons from the outset because Moore had called Kimmons's co-worker, Faith Brown ("Brown"), a "black anaconda" and Kimmons believed that Moore "did not get along with African American employees" and First Transit had fired "other African American employees . . . under unfair circumstances." (Kimmons Decl. ¶ 31.) Brown—who worked in dispatch and "more on the inside" of First Transit's operations and attended meetings involving discussions about Kimmons—often advised Kimmons to be careful, "knew that [Kimmons] was in trouble," and told Kimmons that he was "in trouble" and "out of here." (Kimmons Dep. 87:23-89:25, 115:20-25.)

[Moore] something on the order that [Kimmons's] condition could improve[,] and [Kimmons] could meet [the] criteria in the future to be certified for a DOT medical card." (Singh Dep. 43:2-25, 45:1-6.)

Additionally, Sawyer agreed that although Dr. Singh purportedly stated that Kimmons should have answered "[y]es" instead of "[n]o" to question five on Dr. DeCapua's DOT long form regarding heart problems, and Kimmons, who was "not expected to be a medical expert," answered the "question[] differently" during his last visit with Dr. Singh, Dr. DeCapua's DOT long form "clearly indicates" that Kimmons told Dr. DeCapua (and thus Dr. DeCapua knew) that Kimmons suffered from CHF. (Sawyer Dep. 55:19-60:2; Snyder Decl. Ex. K at 1-5) (bold omitted).

With respect to the "difference in [Kimmons's] answers" of "not sure" followed by "no," Sawyer testified that Dr. Singh "implied" that Kimmons "may not have known" the answer was "yes" in "the first exam," but "after [Dr. Singh] spoke to him," Kimmons should have known the answer was "yes, he did actually have a heart problem." (Sawyer Dep. 58:13-59:24; *see also id.* 17:11-18:19, relying solely on the different answers of "I don't know" followed by "no" to Drs. Singh and DeCapua, respectively; Ridgeway Decl. Ex. B at 50, relying on the same answers; *cf.* Ridgeway Decl. Ex. D at 2, noting that Kimmons answered "[n]o to the same question during his initial October 10, 2019 visit with Dr. Singh; Singh Dep. 24:4-28:6, 45:1-14, 48:16, 22, 53:4-56:25, failing to reflect that Dr. Singh took issue with the initial "no" answer or addressed the "not sure" and "yes" answers, or confirmed his review of or discussions about Dr. DeCapua's certification).

On January 23, 2020, Sawyer emailed First Transit's western division's regional safety manager, Margie Conklin ("Conklin"), human resources manager, senior director of safety, and

vice president, and the general managers at First Transit's two other LIFT locations. (Sawyer Dep. 13:3-14:17, 47:16-21; Ridgeway Decl. Ex. B at 50-51.) Sawyer called Conklin before sending the email because he wanted "advice on how" he and First Transit "should proceed with [Kimmons's] employment" situation. (Sawyer Dep. 13:3-8, 21:9-25.) According to Sawyer, Conklin stated that she believed that Sawyer was only "allowed to accept information" from Dr. Singh because he was the "first doctor [First Transit] sent" Kimmons to visit, "if there was a second opinion [from Dr. DeCapua], [Dr. DeCapua] needed to speak with [Dr. Singh] to give [First Transit] a clearance for [Kimmons] to come back," and "[u]ntil [Dr. Singh] gave [First Transit] clearance for [Kimmons] to return to work, [Kimmons] could not return to work." (*Id.* 21:16-25.)

In his post-call email, Sawyer stated that he was "confirming" the details of his conversation with Conklin, and attempted to "summarize what had occurred with . . . Kimmons" as "accurate[ly] as possible[.]" (Ridgeway Decl. Ex. B at 50; Sawyer Dep. 28:9-16.) Sawyer suggested that Moore initially scheduled Kimmons for a joint fitness-for-duty examination and DOT medical recertification examination because Kimmons's DOT card was set to expire on December 31, 2019. (*See* Ridgeway Decl. Ex. B at 50.) Sawyer, however, testified that Moore handled "this part of [the] operation," he could not "say with 100 percent accuracy . . . exactly what [Moore initially] sent [Kimmons] for," First Transit allows LIFT drivers to "go anywhere they want" when they need to renew their DOT medical certification, and if the driver goes to a clinic that does not have a contract with First Transit, the driver covers their own costs. (Sawyer Dep. 48:11-49:24.) It is also undisputed that Dr. Singh did not complete a DOT medical certification exam on October 10, 2019. (Singh Dep. 20:6-11, 21:15-22:16; Ridgeway Decl. Ex. A at 59-62.)

PAGE 25 – OPINION AND ORDER

In his email, Sawyer also stated that Kimmons's cardiologist cleared him to return to work despite his CHF diagnosis, Kimmons disagreed with Dr. Singh's refusal to "pass[] him" and "intended to get a second opinion," and Sawyer told Kimmons he was "willing to take his second opinion and pass it along to [Dr. Singh] at Providence." (Ridgeway Decl. Ex. B at 50.) Sawyer proceeded to explain that "several weeks later," Kimmons returned with a "valid [DOT] medical card" from "another source" and provided him with the DOT long form he completed, his DOT medical card, and verbal authorization to give the information to Dr. Singh "for a re-evaluation." (*Id.*)

Sawyer further explained that Dr. Singh—who, like First Transit, never communicated with Dr. DeCapua (Singh Dep. 34:1-35:7; Sawyer Dep. 18:20-19:15)—reviewed Dr. DeCapua's records and stated that Kimmons "falsely completed" the DOT long form given his different answer to question five, he "put Kimmons into the [FMCSA] national registry," and he spoke to Dr. DeCapua, who confirmed that she "had not" checked the FMCSA registry. (Ridgeway Decl. Ex. B at 50.) Sawyer added that Dr. Singh told him that CHF was "a permanent disqualifier for a CDL holder," he had not allowed Kimmons to return to work, Kimmons remained on medical leave, he received a grievance from the union regarding (and there was a "threat of a lawsuit for unjust termination" stemming from) his refusal to accept Kimmons's DOT medical card from Dr. DeCapua, and he believed that First Transit should terminate Kimmons and met "all of the required steps" to do so because of Kimmons's "inability to obtain a valid medical card." (*Id.* Ex. B at 50-51.) Sawyer encouraged First Transit to report Kimmons and Dr. DeCapua, if possible, for "purposely falsif[ying] [the] long form" and "fail[ing] to check the registry," respectively. (*Id.* at 51.)

///

On January 24, 2020, Kimmons and Hoeft presented for a follow-up meeting with Sawyer, and Hoeft took notes. (Kimmons Decl. ¶ 49; Hoeft Decl. ¶ 17; *see also* Christiansen Decl. ¶ 15, noting that Hoeft previously "took notes" during Christiansen's meetings). Sawyer accused Kimmons of "doctor shop[ing]," lying to and failing to inform Dr. DeCapua about his CHF, and lying on his DOT long form "to get his DOT card," cited his discussions with Dr. Singh, and "attacked discrepancies" between Kimmons's most recent DOT long forms. (Kimmons Decl. ¶ 49; Hoeft Decl. ¶ 17.) Sawyer also stated, "without evidence," that Dr. DeCapua failed to review the FMSCA registry, Dr. DeCapua would not have certified Kimmons if he had "come clean" about his CHF, the authorities would be contacting Kimmons "shortly," Kimmons "would be arrested and sent to jail," Dr. DeCapua "would lose her medical license," and Kimmons and Dr. DeCapua would be prosecuted. (Hoeft Decl. ¶ 17; Kimmons Decl. ¶¶ 46, 49.)

Near the conclusion of the January 24, 2020 meeting, Kimmons requested a copy of his personnel file and Sawyer allowed Hoeft to make a copy. (Kimmons Decl. ¶ 50; Hoeft Decl. ¶ 18; *cf.* Ridgeway Decl. Ex. B at 51, reflecting that Sawyer's January 23, 2020 email stated that "Kimmons requested a certified copy of all of his records" and Sawyer would "be making copies"). Hoeft discovered a previously absent September 7, 2018 letter of warning about the bus incident in Kimmons's file when he was making copies. (Hoeft Decl. ¶¶ 18, 20.) Hoeft also "saw no correspondence between First Transit and Dr. Singh [demonstrating] that Dr. Singh [ever received] a copy of Dr. De[C]apua's [DOT certification] records before January 24, 2020." (*Id.* ¶ 18.)

///

///

Later on, and without obtaining any release from Kimmons, Sawyer allowed Hoeft to make copies of the medical records he held and cited during the meeting. (Hoeft Decl. ¶ 18; Kimmons Decl. ¶ 51.)

The following month, on February 20, 2020, Kimmons filed a complaint against First Transit with the Oregon Bureau of Labor and Industries ("BOLI"), alleging, among other things, that First Transit discriminated and retaliated against him on the basis of his race, disability, age, use of protected medical leave, and testimony in Christiansen's case. (Ridgeway Decl. Ex. I at 1-4.)

On March 2, 2020, Moore completed and signed a "Termination Profile" with an effective date of March 3, 2020, wherein she indicated that First Transit fired Kimmons for "[f]alsifying/[a]ltering [r]ecords" and Kimmons was not eligible for rehire or severance. (Ridgeway Decl. Ex. B at 52; *see also* Sawyer Dep. 17:11-18:19, 58:13-59:24; Sawyer Decl. ¶ 8, confirming that Sawyer terminated Kimmons "[f]or falsifying his . . . DOT long form" on December 13, 2019 given the difference between his answer to question five when compared to his visit with Dr. Singh on December 3, 2019). Sawyer signed, dated, and confirmed his approval of the Termination Profile two days later, and First Transit's then-owner, FirstGroup America ("FGA"), and FGA's human resources information system administrator were listed as the intended recipients. (Ridgeway Decl. Ex. B at 52; *see also* Sawyer Dep. 44:22-45:4, stating that First Transit was "part of" and "owned outright" by FGA, a "multinational corporation based out of Scotland"; Sawyer Decl. ¶ 8, stating that Sawyer decided to terminate Kimmons effective March 3, 2020).

Moore and Sawyer completed the Termination Profile and terminated Kimmons but never told Kimmons they fired him. (Kimmons Decl. ¶ 52.) Kimmons did not receive any "letter

of termination" from First Transit and instead "learn[ed] about the termination [in] May 2020, when [he] received a check paying [him] out on [his] accrued vacation." (*Id.*; Ridgeway Decl. Ex. B at 55.)

Notably, the record includes an undated letter from Sawyer to Kimmons, which is titled "Notice of Temporary Layoff Due to Coronavirus." (Ridgeway Decl. Ex. B at 53) (bold omitted). The letter stated that Kimmons was "being laid off on a temporary basis effective April 30, 2020," Kimmons's benefits would end on May 1, 2020, and First Transit would "pa[y] out" any of Kimmons's "unused vacation" on April 30, 2020. (*Id.*) The letter added that Kimmons's temporary layoff was "not an action taken due to dissatisfaction with [Kimmons's] work performance," and First Transit "look[ed] forward to seeing [Kimmons] back working with [First Transit]." (*Id.*)

Sawyer stopped working for First Transit in "April 2020," because he "found a position with another company." (Sawyer Dep. 5:11-25; *but cf.* Sawyer Decl. ¶ 1, stating that Sawyer held his general manager role at First Transit until "2021"; Decl. Benjamin Sawyer Supp. Def.'s Reply Supp. Mot. Summ. J. ("Second Sawyer Decl.") ¶ 1, ECF No. 55, repeating the same statement). Around the same time, Sawyer's and Kimmons's work location on Nela Street laid off LIFT drivers, closed, and never reopened. (Sawyer Decl. ¶¶ 1, 7, 9; Hoeft Decl. ¶¶ 5, 7, 21; Kimmons Decl. ¶ 11; Ridgeway Decl. Ex. B at 53.) Some of the drivers went to work at other First Transit locations or "got First Transit jobs picking up Nike bicycle share equipment," i.e., the "orange bikes located around Portland." (Hoeft Decl. ¶ 21; Rockstead Decl. ¶¶ 2-4.)

On August 6, 2020, Kimmons underwent a "repeat" EKG. (Snyder Decl. Ex. S at 1.) According to Dr. Strelich, Kimmons's repeat EKG "show[ed] normalization of his [EF] to 60-65%." (*Id.*) Based on her experience as a cardiologist, Dr. Strelich believes that the EF

measurements from EKGs are more reliable than the ones from nuclear stress tests, which is why she previously relied on Kimmons's August 14, 2019 EKG EF of "40-45%" and considered it to be a more "accurate representation of [Kimmons's] heart function." (*Id.*) Dr. Strelich released Kimmons to return to work full-time on October 9, 2019, in large part because "he was not experiencing . . . limiting CHF symptoms." (*Id.*) Although a registered nurse noted "NYHA class III symptoms at one point" in Kimmons's medical records, Dr. Strelich stated that this did "not reflect [her] opinion," and Kimmons currently has a "clean bill of health." (*Id.*; Kimmons Decl. ¶ 53.)

At some point after First Transit lost the Tri-Met LIFT contract in 2021, First Transit offered "the union, but not . . . Kimmons, the chance to allow . . . Kimmons to reapply for another part-time position," albeit one with "no employee benefits" or "retention of [union] seniority" and unaccompanied by an "offer to pay [Kimmons] any back wages." (*See* Hoeft Decl. ¶ 15, noting that Kimmons's grievance "did not go forward to a grievance hearing after First Transit lost the L[IFT] contract" and First Transit "eventually" extended this offer to the union; Rockstead Decl. ¶ 3, stating that First Transit lost the LIFT contract in 2021; *see also* Kimmons Decl. ¶ 52, questioning why First Transit would have extended an offer to Kimmons if he had "done something wrong" like falsifying records). The record also suggests that First Transit may have recently called Kimmons about "want[ing] him to come back to work[.]" (Sawyer Dep. 60:7-12.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d

885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

Kimmons asserts claims against First Transit for violations of the FMLA, Title VII, the ADEA, the ADA, and ORS chapters 653 and 659A, and wrongful discharge. First Transit moves for summary judgment on all of Kimmons's claims. (Def.'s Mot. Summ. J. ("Def.'s Mot.") at 1, ECF No. 28.)

## I.    FMLA AND STATE COUNTERPART

In his first and second claims for relief, Kimmons asserts claims against First Transit for violations of the FMLA and Oregon Family and Medical Leave Act ("OFLA"). (Compl. ¶¶ 26-48, ECF No. 1.) Courts "analyze FMLA and OFLA claims together because OFLA claims are to 'be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA].'" *Munger v. Cascade Steel Rolling Mills, Inc.*, No. 21-35573, 2023 WL 128616, at *1 (9th Cir. Jan. 9, 2023) (quoting OR. REV. STAT. § 659A.186(2) and citing *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011)); *see also Kelly v. Boeing Co.*, 848 F. App'x 692, 695 n.2 (9th Cir. 2021) (discussing "FMLA and OFLA claims together" for the same reason).

### A.    Applicable Law

"The FMLA provides job security to employees who must be absent from work because of their own illnesses, to care for family members who are ill, or to care for new babies." *Olson v. U.S. ex rel. Dep't of Energy*, 980 F.3d 1334, 1337 (9th Cir. 2020) (quoting *Bachelder v. Am.*

*W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001)). Under the FMLA, it is "unlawful for an employer to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided by the Act." *Id.* at 1337-38 (quoting *Bachelder*, 259 F.3d at 1122, which quoted 29 U.S.C. § 2615(a)(1)).

Ninth Circuit caselaw has "recognized two theories of recovery for violations of § 2615(a), 'the retaliation or discrimination theory and the entitlement or interference theory.'" *Id.* at 1338 (quoting *Sanders*, 657 F.3d at 777). Although "the FMLA does not clearly delineate these two claims with the labels [of] 'interference' and 'retaliation,' [courts use these two] labels . . . in describing an employee's claims under the [FMLA]." *Id.* (quoting *Sanders*, 657 F.3d at 777).

Kimmons's response suggests (and Kimmons's counsel stated during oral argument) that this is an interference case. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") at 20-24 & n.1, ECF No. 43, focusing on an interference theory and describing an inapplicable retaliation or discrimination theory in a footnote; *cf.* Compl. ¶¶ 26-48; *see also* Def.'s Mot. at 17-18, arguing that the complaint does not assert a discrimination theory). The Court agrees that this is an interference case.

Kimmons's theory is that First Transit failed to reinstate him, and instead used his protected leave as a negative factor in its decision to terminate him. (*See* Pl.'s Resp. at 20-24, focusing on reinstatement and termination; Compl. ¶¶ 37, 47, citing termination as the adverse employment action).[15] Courts have construed such a claim as an interference claim. *See Rieman v. Evraz, NA*, 848 F. App'x 306, 307 (9th Cir. 2021) ("We construe [an OFLA] claim like

---

[15] Kimmons previously acknowledged that he is not relying on his alleged exclusion from a business dinner and bonus-related allegations in paragraph thirty-seven of his complaint as adverse actions. (Ridgeway Decl. Ex. G at 1.) As a result, the Court does not address these allegations.

[plaintiff]'s—that a termination was motivated by an employee's use of protected leave—as an 'interference' claim, rather than a 'retaliation' claim." (quoting *Bachelder*, 259 F.3d at 1124)); *Clark v. AmTrust N. Am.*, 792 F. App'x 456, 458-59 (9th Cir. 2019) (noting that the plaintiff "allege[d] retaliation under the FMLA," where the defendant failed to reinstate the plaintiff and used the plaintiff's "leave as a negative factor in terminating her employment," and therefore "constru[ing] [the plaintiff's] allegation as an interference claim" under the FMLA and state counterpart).

To prevail on his interference claim, Kimmons "must 'prove by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [him].'" *Williams v. G&K Servs., Inc.*, 774 F. App'x 369, 370 (9th Cir. 2019) (quoting *Bachelder*, 259 F.3d at 1125); *see also Rieman*, 848 F. App'x at 307 (describing the same standard after noting that "[i]nterference claims are not subject to the *McDonnell Douglas* [burden-shifting] framework" (citing *Bachelder*, 259 F.3d at 1125 and referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Kimmons can survive summary judgment by "present[ing] circumstantial evidence of a link between his FMLA request and his termination." *Rouse v. Wynn Las Vegas, LLC*, 829 F. App'x 746, 748 & n.3 (9th Cir. 2020) (reversing the district court's grant of summary judgment in favor of the employer on a FMLA interference claim, and noting that the plaintiff "presented circumstantial evidence of a link between his FMLA request and his termination" and thus there was "a genuine dispute" as to whether the defendant "used [the plaintiff's FMLA] request as a negative factor in its decision to terminate him").

First Transit moves for summary judgment on Kimmons's FMLA (and OFLA) claims on two grounds. (Def.'s Mot. at 13-17.) First Transit argues that it was entitled to terminate

Kimmons and did not violate any right to reinstatement because Kimmons exhausted his twelve weeks of FMLA leave and still "was not released to work." (Def.'s Mot. at 13-15.) In support of this argument, First Transit notes that it "continued [Kimmons's] medical leave through his termination on March 3, 2020," but "[a]ny entitlement to protected FMLA/OFLA leave exhausted [twelve] weeks after his first day of leave began, *i.e.*, November 27, 2019." (Def.'s Mot. at 15; *see also* Ridgeway Decl. Ex. A at 55, noting that Kimmons took leave beginning on September 3, 2019).

First Transit also argues that it had "an honest belief that it terminated Kimmons's employment for legitimate reasons" unrelated to Kimmons's use of protected leave. (Def.'s Mot. at 15-17.) Specifically, First Transit argues that because it terminated Kimmons for "falsif[ying] [an] answer[]" on his DOT long form, Kimmons's leave did not factor into its decision. (*Id.* at 15-16.)

The Court finds that genuine issues of material fact preclude summary judgment in First Transit's favor on Kimmons's FMLA and OFLA claims. The Court therefore denies First Transit's motion on this ground.

It is true that "[t]he FMLA does not grant a right to reinstatement to employees who are unable to perform the essential functions of their positions." *Clink v. Or. Health & Sci. Univ.*, No. 3:13-cv-01323-SI, 2014 WL 3850013, at *9 (D. Or. Aug. 5, 2014) (citations omitted). In *Nelson v. Unified Grocers, Inc.*, No. 3:10-cv-00531-PK, 2012 WL 113742, at *1 (D. Or. Jan. 12, 2012), for example, the district court granted the defendant's motion for summary judgment on FMLA and OFLA claims because it was "undisputed that [the plaintiff] took the full amount of leave to which he was entitled, and . . . there [was] no material dispute that [the plaintiff] was unable to work for at least several months post-discharge." *Id.* Similarly, in *Clink*, the record

showed that the plaintiff "was unable to perform the essential functions of his position and failed to notify [the defendant] that [he] was able to do so before his [twelve weeks of] FMLA leave exhausted." 2014 WL 3850013, at *9. As a result, the district court granted the defendant's motion for summary judgment on the plaintiff's FMLA "interference claim related to his reinstatement," because the defendant terminated the plaintiff "not because he exercised his FMLA rights, but for other legitimate reasons," which did "not violate the FMLA." *Id.* (citations omitted).

This case is distinguishable from cases like *Clink* and *Nelson*, the latter on which First Transit relies. (*See* Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply") at 9, ECF No. 53; *see also* Def.'s Mot. at 14.) Unlike those cases, genuine issues of material fact preclude summary judgment here. The genuine issues of material fact include, but are not limited to, whether (1) Dr. DeCapua completed the only DOT physical in 2019, which Kimmons passed; and (2) Kimmons was released and able to return to work before First Transit terminated his employment or claims that his protected leave expired, and timely notified First Transit of the release.

Viewing the evidence in the light most favorable to Kimmons and drawing all reasonable inferences in Kimmons's favor, as the Court must on summary judgment, the record suggests that Dr. Singh never completed the steps necessary for a DOT physical, First Transit prevented Kimmons from returning to work between October 2019 and March 2020, and Kimmons worked a full day on or about September 25, 2019, took additional leave, provided First Transit with his cardiologist's release to return to work on October 4, 2019, and passed the only complete DOT physical he received before his DOT card expired on December 31, 2019, and he nevertheless lost his job.

PAGE 35 – OPINION AND ORDER

Moreover, the record suggests that Kimmons never received adequate notice about the need to present for a fitness-for-duty certification, Kimmons was entitled to "go anywhere [he] want[ed]" for a DOT physical, First Transit wanted Kimmons to undergo a DOT physical at all relevant times, and First Transit did not oppose Kimmons's request to pursue his DOT physical with Dr. DeCapua.[16] (*See* Kimmons Decl. ¶¶ 30, 34, stating that neither First Transit nor Dr. Singh advised Kimmons that First Transit wanted him to present for a fitness-for-duty certification; Ridgeway Decl. Ex. B at 50, suggesting that Sawyer and Moore sent Kimmons for "a 'fit-for-duty' evaluation . . . [and] to re-certify [his DOT medical card] as well" because it was "set to expire"; Sawyer Dep. 48:11-49:24, reflecting that Sawyer testified that First Transit allows drivers to "go anywhere they want" when they need to renew their DOT medical card, and if the driver goes to a clinic that does not have a contract with First Transit, the driver covers their own costs).

///

---

[16] "A fit-for-duty certification is a release from a health care provider indicating that the employee is able to perform the essential functions of a position." *Clink*, 2014 WL 3850013, at *3 n.4 (citation omitted). If an employee must present for a fitness-for-duty certification, an employer must satisfy certain notice requirements. *See* 29 C.F.R. § 825.300(d)(3) ("If the employer will require the employee to present a fitness-for-duty certification to be restored to employment, the employer must provide notice of such requirement with the designation notice. If the employer will require that the fitness-for-duty certification address the employee's ability to perform the essential functions of the employee's position, the employer must so indicate in the designation notice, and must include a list of the essential functions of the employee's position."); *id.* § 825.312(d) ("The designation notice required in § 825.300(d) shall advise the employee if the employer will require a fitness-for-duty certification to return to work and whether that fitness-for-duty certification must address the employee's ability to perform the essential functions of the employee's job."). First Transit argues that it "followed its [own] policy" in sending Kimmons for a fit-for-duty examination and certification. (*See, e.g.*, Def.'s Reply at 8 & Def.'s Mot. at 8-9, citing Biggs Decl. Ex. A at 1-5.) During oral argument, First Transit's counsel also suggested that First Transit's policy alone constituted sufficient notice. The record, however, does not reflect that First Transit even followed its own procedure on fit-for-duty certifications. (*See* Biggs Decl. Ex. A at 3, describing an individuated assessment process and form, and how the local general manager initiates it by providing the employee with certain documents).

It is true that First Transit could have fired Kimmons based on conduct that FMLA does not protect, such as falsifying DOT and safety-related employment forms. (*See* Biggs Decl. ¶ 10, noting past terminations for "falsifying records," such as a DOT long form; *id.* Ex. B at 4, reflecting that the CBA listed "[k]nowingly falsifying of any documents" as a cause for immediate discharge). To be sure, "an employer may not use FMLA leave as a negative factor in an adverse employment decision, [but it] may base a decision on an employee's conduct that is not protected by the FMLA, such as an employee's performance problems," *Clark*, 792 F. App'x at 459 (simplified), or violation of employment policies. *See Cobb v. Alaska Airlines*, No. 22-35240, 2023 WL 2624784, at *1-2 (9th Cir. Mar. 23, 2023) (holding that the plaintiff had "not presented material evidence of an interference claim," noting that the "use of FMLA leave itself did not appear to be a negative factor" in the termination, and explaining that the defendant "consistently allowed [the plaintiff] to take FMLA leave . . . when it was requested and approved according to company policies," and only terminated the plaintiff after he failed to comply with the defendant's policies by invoking FMLA at the "last-minute . . . to excuse his scheduled work shifts").

However, there is a genuine issue of fact as to whether Kimmons's taking of FMLA leave constituted a negative factor in First Transit's decision to terminate him. On this record and even assuming the Ninth Circuit would recognize a so-called honest-belief defense in this context, a reasonable jury could find that First Transit did not have "an honest belief that it terminated Kimmons's employment for legitimate reasons" unrelated to his protected activity.[17] (Def.'s Mot. at 15-17.)

---

[17] The Third, Seventh, and Tenth Circuits have "allow[ed] [an] 'honest belief' defense to [FMLA] interference claims," and the Sixth Circuit has questioned whether an "employer may defeat an interference claim solely on the basis of its honest belief (even if mistaken)" but

First Transit effectively investigated whether Dr. DeCapua's DOT medical certification was sufficient to allow Kimmons to return to work, or instead stemmed from Kimmons's failure to inform Dr. DeCapua about his CHF. (*See* Kimmons Decl. ¶ 46, noting that during the January 10, 2020 meeting, Sawyer agreed to confer with Dr. Singh about Dr. DeCapua's certification and warned Kimmons that if he discovered that Kimmons failed to inform Dr. DeCapua about his CHF, he would have Kimmons "criminally prosecuted to the full extent of the law"). Sawyer stated that during his inquiry into the matter, Dr. Singh told him that he spoke to Dr. DeCapua, who confirmed that she had not checked the FMCSA registry, Kimmons's CHF was "a permanent disqualifier for a CDL holder," and Kimmons "falsely completed" question five on Dr. DeCapua's DOT long form. (Sawyer Dep. 19:16-23, 29:5-21, 38:6-18; Ridgeway Decl. Ex. B at 50-51.)

Dr. Singh, however, testified that he did not know Dr. DeCapua and never communicated with Drs. DeCapua, Strelich, or Myint, let alone in regard to Kimmons. (Singh Dep. 34:1-35:7.) Dr. Singh also testified that months before any purported contact with Sawyer, he "would have told [Moore] something on the order that [Kimmons's] condition could improve[,] and [Kimmons] could meet [the] criteria in the future to be certified for a DOT medical card." (Singh Dep. 43:2-25, 45:1-6.)

In addition, Sawyer agreed that Dr. DeCapua's DOT long form "clearly indicates" that Kimmons told her (and thus she knew) that Kimmons suffered from CHF and had "retain[ed] too

---

declined to resolve the "thorny issue." *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 354 (6th Cir. 2013) (citations omitted). The Fourth Circuit has likewise declined to address the issue. *See Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 795 (4th Cir. 2023) ("The law is unsettled on application of the honest belief doctrine as a defense to an FMLA interference claim. . . . [W]e have not, however, do so here because the plaintiffs' claim otherwise fails."); *see also Capps v. Mondelez Global, LLC*, 847 F.3d 144, 153-54 & n.8-9 (3d Cir. 2017) (discussing the genesis of the "honest belief" doctrine and comparable discrimination applications). It does not appear that the Ninth Circuit has resolved the issue.

much water." (Sawyer Dep. 55:19-60:2; Snyder Decl. Ex. K at 1-5) (bold omitted). The record also suggests that Kimmons previously answered question five the same way when he visited Dr. Singh, and that after he did so and before he repeated that answer to Dr. DeCapua, Kimmons, who believed that his heart condition was not permanent, could be "overcome," and would "go away" and "return[] to normal" if he "started taking the diuretics again," began an exercise program (i.e., jogging and going to a gym) with the "intention to improve [his] physical stamina and fitness." (Ridgeway Decl. Ex. D at 2; Kimmons Decl. ¶¶ 22, 39; Kimmons Dep. 38:25-39:17.)

Further, during Sawyer's January 24, 2020 meeting with Kimmons, Hoeft discovered that a previously absent and unwarranted September 2018 letter of warning was now part of Kimmons's file. (Hoeft Decl. ¶¶ 18, 20.) Hoeft added that he "saw no correspondence between First Transit and Dr. Singh [demonstrating that Dr. Singh [ever received] a copy of Dr. De[C]apua's [DOT certification] records before January 24, 2020." (*Id.* ¶ 18.) The summary judgment record also includes an undated letter from Sawyer to Kimmons, which is titled "Notice of Temporary Layoff Due to Coronavirus," and states that Kimmons was "being laid off on a temporary basis effective April 30, 2020," Kimmons's temporary layoff was "not an action taken due to dissatisfaction with [Kimmons's] work performance," and First Transit "look[ed] forward to seeing [Kimmons] back working with [First Transit]." (Ridgeway Decl. Ex. B at 53) (bold omitted).

Despite these facts, Sawyer (with Moore's assistance) terminated Kimmons in March 2020 for falsifying his answer to question five on Dr. DeCapua's DOT long form, not because he exhausted his leave and still was unable to pass a DOT physical. (Ridgeway Decl. Ex. B at 52; Sawyer Dep. 17:11-18:19, 58:13-59:24; Sawyer Decl. ¶ 8.) Clearly, First Transit's "honest

belief" that it had a "legitimate," non-FMLA reason for terminating Kimmons is based on

disputed facts and conflicting testimony from key witnesses. Such matters are inappropriate for

resolution on summary judgment. *See Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017)

("[W]here evidence is genuinely disputed on a particular issue—such as by conflicting

testimony—that 'issue is inappropriate for resolution on summary judgment.'") (citation

omitted); *see also Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 345 (5th Cir. 2022)

("Summary judgment is not appropriate when questions about the credibility of key witnesses

loom large and the evidence could permit the trier-of-fact to treat their testimony with skeptical

scrutiny.") (simplified).

      In *Rouse*, the Ninth Circuit similarly held that there was a genuine dispute as to whether

the defendant used the plaintiff's leave request as "a negative factor in its decision to terminate

him." 829 F. App'x at 748. The Ninth Circuit explained that the plaintiff had "presented

circumstantial evidence of a link between his FMLA request and his termination," including the

close "temporal proximity" between the protected activity and adverse action and the plaintiff's

evidence that his supervisor, who was aware of the protected activity, "conducted [an]

investigation" of an underlying incident before making the decision to terminate the plaintiff's

employment. *Id.* In support, the Ninth Circuit emphasized that "[w]here [a defendant's]

termination decisions rely on subjective evaluations, careful analysis of possible impermissible

motivations is warranted because such evaluations are particularly susceptible of abuse and more

likely to mask pretext." *Id.* (quoting *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir.

2003)).

      Similarly here, Kimmons has presented circumstantial evidence of a link between his

protected activity and termination. The Court therefore denies First Transit's motion for

summary judgment on Kimmons's FMLA and OFLA interference claims. *See generally Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021) (stating that on summary judgment, courts "do not engage in credibility determinations or weigh evidence; rather, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor") (simplified); *cf. Cole v. Roadway Express, Inc.*, 218 F. Supp. 2d 350, 352-56 (W.D.N.Y. 2002) (showing that in a summary judgment case on which First Transit relies, there was "no admissible evidence to support [the] plaintiff's theory" of disability discrimination under the ADA); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (noting that the "evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial").

## II.    WRONGFUL DISCHARGE

First Transit agrees with Kimmons that if his FMLA/OFLA interference claims survive summary judgment, Kimmons's wrongful discharge claim should also survive summary judgment. (*See* Def.'s Mot. at 34-36; Pl.'s Resp. at 42-44; Def.'s Reply at 29; *see also* Compl. at 18-20, listing the wrongful discharge claim as Kimmons's eleventh claim for relief.) The Court therefore denies First Transit's motion for summary judgment on Kimmons's wrongful discharge claim.

## III.    OREGON SICK LEAVE ACT

In his third claim for relief, Kimmons asserts a claim against First Transit for violation of ORS § 653.641, which the parties refer to as the Oregon Sick Leave Act ("OSLA"). (*See* Compl. at 9-10.)

The OSLA provides, in relevant part, that it is an unlawful practice for an employer to (1) "interfere with, restrain or fail to pay for sick time to which an employee is entitled," or (2) "retaliate or in any way discriminate against an employee with respect to any term or condition

of employment because the employee has . . . taken sick time[.]" OR. REV. STAT. § 653.641(1)-(2). Kimmons bases his OSLA claim on his allegation that First Transit interfered with his sick time, and discriminated and retaliated against him for taking sick time, by refusing to allow him to return to work and discharging him. (Compl. ¶¶ 54, 56-57.) Kimmons seeks to recover back pay. (*Id.* ¶ 57.)

First Transit moves for summary judgment on Kimmons's OSLA claim. (Def.'s Mot. at 18.) First Transit argues that Kimmons "used, and was paid for, all 60 hours of sick time" to which he was entitled by the "first half of 2019," and "[l]ike his FMLA/OFLA claims, [he] cannot show that [First Transit] terminated him for using paid sick time[.]" (*Id.*) First Transit adds that the absence of an improper motive is "bolstered by" Kimmons's testimony that First Transit "took no adverse action against him because he took time off work." (*Id.*, citing Kimmons Dep. 116:6-9.)

First Transit's reliance on Kimmons's testimony is unpersuasive. First Transit cites the second portion of this excerpt:

> Q. So I want to know about a specific employment action that was taken against you because you took medical leave and you [just] said Faith Brown is a witness. What [action] did she see taken against you?
>
> A. I don't remember. I don't recall.
>
> Q. Was any employment action taken against you because you took medical leave?
>
> A. You're asking me these open-ended questions that -- that -- no.

(Kimmons Dep. 116:6-9.) Kimmons had previously explained that before First Transit fired him, Brown—who worked in dispatch and "more on the inside" of First Transit's operations and attended meetings involving discussions about Kimmons—often advised Kimmons to be careful, "knew that [Kimmons] was in trouble," and told Kimmons that he was "in trouble" and "out of

here." (Kimmons Dep. 87:23-89:25, 115:20-25.) Kimmons also testified that he did not "know if anybody saw" that First Transit took "any employment action . . . against [him] because [he] took medical leave" but "it was known," and that after he took leave multiple times in 2019, he was "fighting somebody from First Transit who didn't want [him] there anymore." (*Id.* 85:3-14, 91:14-18.)

Given this testimony and the disputed facts and evidence discussed above, the Court concludes that First Transit has failed to demonstrate that it is entitled to summary judgment on Kimmons's OSLA claim. On this record, Kimmons's exhaustion of his sick leave in the first half of 2019, and use of FMLA leave later that year, supports his theory that his use of leave factored into his termination. *See Schultz v. NW Permanente P.C.*, No. 3:20-cv-00626-IM, 2022 WL 267758, at *4 (D. Or. Jan. 28, 2022) ("Even though Plaintiff was allowed to take OFLA- and OSLA-protected leave in 2019, she was—at least for purposes of summary judgment—allegedly subjected to the aforementioned adverse employment actions [after doing so]. It will be up to the jury, not this Court, to determine whether Plaintiff's or Defendant's evidence is ultimately more persuasive.").

## IV.    ADA AND STATE COUNTERPART

In his fourth and fifth claims for relief, Kimmons asserts ADA discrimination and retaliation claims against First Transit. (Compl. at 10-13.) In his sixth claim for relief, Kimmons asserts a nearly identical discrimination claim against First Transit under the Oregon Rehabilitation Act ("ORA"). (*Compare id.* at 10-1, *with id.* at 13-15.) First Transit argues that it is entitled to summary judgment on each claim because they fail as a matter of law. (Def.'s Mot. at 19-25.)

///

///

### A.    Exhaustion of Administrative Remedies

As an initial matter, First Transit argues that Kimmons's ADA and ORA discrimination claims fail as a matter of law because Kimmons failed to exhaust his remedies under 49 C.F.R. § 391.47. (Def.'s Mot. at 19-21.) The Court disagrees and thus denies First Transit's motion on this ground.

### 1.    Applicable Law

On the issue of exhaustion, the parties focus on *Marshall v. Gordon Trucking, Inc.*, 215 F. Supp. 3d 1036, 1040-41 (D. Or. 2016), a persuasive authority from this district. (*See* Def.'s Mot. at 19-21; Pl.'s Resp. at 25; Def.'s Reply at 14-15.) In *Marshall*, the district court observed that "[w]hen a dispute arises regarding a driver's medical qualification based on a conflict of medical opinion, the DOT has established an administrative process to address the dispute under 49 C.F.R. § 391.47." 215 F. Supp. 3d at 1040. After recognizing that the Ninth Circuit had "not addressed the issue of a plaintiff's failure to exhaust DOT administrative remedies in an ADA case," the district court noted that "a plaintiff who contends his motor-carrier employer violated his rights under the ADA is not specifically required under any statute to exhaust the administrative remedies provided under 49 C.F.R. § 391.47[,] nor does 49 C.F.R. § 391.47 refer specifically to ADA or discrimination claims," but other "[c]ourts following [an Eight Circuit decision] have, nevertheless, found it prudent to impose an exhaustion requirement because of the DOT's greater competence in determining when its safety-regulation requirements are being met." *Id.* at 1040-41 (citing, *inter alia*, *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 638 (8th Cir. 2003)).

The district court in *Marshall* followed suit. *Id.* at 1041. Given that the "[p]laintiff's physician performed a medical examination . . . and issued a medical-examiner's certificate indicating [he] was medically qualified to drive a [CMV]" and the "[d]efendant's medical

examiner disagreed and determined [the] [p]laintiff was not medically qualified," the district court found that "this resulting 'disagreement' concerning [the] [p]laintiff's 'ability to operate a [CMV] safely' should have been resolved pursuant to the administrative process set out in 49 C.F.R. § 391.47." *Id.* As a result, there was "not a genuine dispute of material fact that an administrative process exist[ed] to resolve the dispute as to [the] [p]laintiff's medical qualifications to drive a commercial vehicle." *Id.* After noting that it was undisputed that the plaintiff did not exhaust his administrative remedies and the plaintiff had not shown that such remedies were effectively unavailable to him, the district court found that the outstanding conflict as to whether the plaintiff was medically qualified to drive a CMV meant that it had not been established that the plaintiff was an otherwise "qualified individual" under the ADA. *Id.* at 1041-43. Invoking the doctrine of primary jurisdiction, "a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decision making responsibility should be performed by the relevant agency rather than the courts," the district court referred the matter back to the DOT for resolution of the outstanding conflict in medical opinions and exercised its discretion to retain jurisdiction and stay the case in the interim. *Id.* at 1043-45 (simplified).

Before the district court issued its decision in *Marshall*, the plaintiff secured a reversal on appeal. *See Marshall v. Gordon Trucking, Inc.*, 649 F. App'x 573, 573-74 (9th Cir. 2016). The Ninth Circuit determined that the district court "erred in holding that it lacked subject matter jurisdiction over [the plaintiff's ADA] claims because he failed to exhaust remedies available under [DOT] . . . regulations." *Id.* at 573. Importantly, and after noting that it had recently held that "failure to exhaust is an affirmative defense that should normally be raised through a summary judgment motion," the Ninth Circuit instructed the district court to "apply the *Albino*

framework and resolve any disputed material facts relevant to exhaustion in th[e] case," and

"also consider whether to exercise its discretion to excuse exhaustion or to invoke the doctrine of

primary jurisdiction." *Id.* at 574 (citing *Albino v. Baca*, 747 F.3d 1162, 1170-71 (9th Cir. 2014)

(en banc)).

In the *Albino* decision, the Ninth Circuit described the relevant exhaustion framework as

follows:

> A summary judgment motion made by either party may be, but need not be, directed solely to the issue of exhaustion. If a motion for summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue. . . . [I]f feasible, disputed factual questions relevant to exhaustion should be decided at the very beginning of the litigation.
>
> If the district judge holds that the prisoner has exhausted available administrative remedies, that administrative remedies are not available, or that a prisoner's failure to exhaust available remedies should be excused, the case may proceed to the merits. On appeal, [the Ninth Circuit] will review the judge's legal rulings on exhaustion de novo, but [the Ninth Circuit] will accept the judge's factual findings on disputed issues of material fact unless they are clearly erroneous. . . . [I]f a factual finding on a disputed question is relevant both to exhaustion and to the merits, a judge's finding made in the course of deciding exhaustion is not binding on a jury deciding the merits of the suit. . . .
>
> . . . [T]he basic procedure outlined here—under which a party may move for summary judgment on the exhaustion question, followed, if necessary, by a decision by the court on disputed questions of material fact relevant to exhaustion—is appropriate in . . . other contexts as well.

*Id.* at 1070-71; *see also Marshall*, 649 F. App'x at 573-74 (applying the procedure to the DOT

regulation context).

## 2.    Analysis

The Court denies First Transit's motion for summary judgment on Kimmons's ADA and

ORA discrimination claims, to the extent it is based on Kimmons's alleged failure to exhaust his

administrative remedies.

As noted, "failure to exhaust is an affirmative defense[.]" *Marshall*, 649 F. App'x at 573

(citing *Albino*, 747 F.3d at 1166). Thus, First Transit needed to plead and prove that Kimmons

failed to exhaust his administrative remedies under the DOT regulations. *See Thomas v.*

*Jurgensen*, 849 F. App'x 222, 223 (9th Cir. 2021) (stating that a defendant "must plead and

prove nonexhaustion as an affirmative defense," exercising the discretion to address waiver, an

"issue of law," even though the plaintiff "did not distinctly assert that [the defendant] waived any

reliance on an affirmative defense of exhaustion," and finding that the defendant "raised

exhaustion as an affirmative defense in his answers" but nevertheless waived an exhaustion

defense by "intentionally relinquish[ing]" it via a "litigation position" (quoting *Albino*, 747 F.3d

at 1171)).

The parties here dispute whether First Transit waived nonexhaustion as an affirmative

defense. (*See* Pl.'s Resp. at 25, stating that First Transit "waived" this defense and noting that

"Sawyer did not arrange for the opinion of an impartial medical specialist in the field"; Def.'s

Reply at 15, arguing that Kimmons "misreads the law" on the arrangement of an impartial

medical specialist and cites no authority for the proposition that First Transit waived this

defense).

The Court agrees with Kimmons's position that First Transit waived nonexhaustion as an

affirmative defense. In its answer and affirmative defenses, First Transit pled seven specific

defenses, including the "failure to exhaust contractual remedies."[18] (Answer & Affirmative

Defenses at 11-12; *cf.* Biggs Decl. ¶ 4, stating that First Transit's CMV drivers were members of

the union and subject to the CBA; *see also id.* Ex. C at 2, showing that First Transit's employee

---

[18] By comparison, the defendant in *Marshall* likewise pled several affirmative defenses,
but those defenses included that the plaintiff "failed to first exhaust the administrative remedies
available under the [DOT] regulations." Def.'s Answer & Affirmative Defenses at 7-8, *Marshall
v. Gordon Trucking, Inc.*, Case No. 3:12-cv-01550-BR (D. Or. filed Jan. 11, 2013), ECF No. 20.

handbook states that "[a]ny references to, or discussion of, matters related to employment shall not be treated as a contractual agreement"). First Transit, however, did not plead that Kimmons failed to exhaust his *administrative* remedies under the DOT regulations. As a result, the Court concludes that First Transit waived nonexhaustion of administrative remedies as an affirmative defense.

The Court also notes that to obtain resolution at the administrative level as to conflicting medical opinions, the applicant (i.e., the driver or motor carrier) must meet certain conditions. *See* 49 C.F.R. § 391.47(b) ("Applications will be accepted for consideration only if the following conditions are met."). Those conditions include that "the applicant must submit a copy of an opinion and report including results of all tests of an impartial medical specialist in the field in which the medical conflict arose," and the "specialist should be one agreed to by the motor carrier and the driver." *Id.* § 391.47(b)(3). If the parties cannot agree on a specialist, the conditions differ:

> (i) In cases where the *driver refuses to agree* on a specialist *and the applicant is the motor carrier*, the applicant must submit a statement of his/her agreement to submit the matter to an impartial medical specialist in the field, proof that he/she has requested the driver to submit to the medical specialist, and the response, if any, of the driver to his/her request.

> (ii) In cases where the *motor carrier refuses to agree* on a medical specialist, *the driver* must submit an opinion and test results of an impartial medical specialist, proof that he/she has requested the motor carrier to agree to submit the matter to the medical specialist and the response, if any, of the motor carrier to his/her request.

*Id.* § 391.47(b)(3)(i)-(ii) (emphasis). Additionally, and assuming the aforementioned conditions are satisfied, "[t]he applicant must include a statement explaining in detail why the decision of the medical specialist identified in paragraph (b)(3) of this section, [was] unacceptable." *Id.* § 391.47(b)(4).

///

Here, the record reflects that First Transit drivers can renew their DOT cards with a certified examiner of their choosing, First Transit wanted Kimmons to undergo a DOT physical during all of his relevant visits, and First Transit did not object to Kimmons's request to follow his union's advice to undergo a DOT physical at FIH, a clinic that First Transit had previously used. It is not clear, then, how Kimmons could have, or why Kimmons would have needed to, satisfy § 391.47(b)'s conditions. Arguably, and setting aside the fact that First Transit did not terminate Kimmons based on an inability to pass a DOT physical and thus perform the essential functions of his job, First Transit—not Kimmons—needed to pursue administrative resolution. This is because First Transit agreed that Kimmons could undergo a DOT physical at FIH, where a certified examiner, who does not appear to have a contractual relationship with First Transit or history with Kimmons (i.e., an agreed-upon and impartial medical specialist), passed Kimmons. If it disagreed with Dr. DeCapua's decision, First Transit needed to explain why the decision was "unacceptable."

That said and, in any event, the Court finds that First Transit waived nonexhaustion of administrative remedies as an affirmative defense. The Court therefore denies First Transit's motion for summary judgment on Kimmons's ADA and ORA discrimination claims on this ground.

### B.    Merits of Kimmons's ADA and ORA Claims

First Transit argues that Kimmons's ADA and ORA discrimination claims fail on the merits, as a matter of law, because Kimmons was not a qualified individual with a disability, and First Transit terminated Kimmons for a legitimate, nondiscriminatory "business reason: falsifying his DOT long form." (Def.'s Mot. at 19, 21-24.) First Transit also suggests that Kimmons failed adequately to establish a prima facie case of retaliation under the ADA. (Def.'s Mot. at 25.)

Before addressing these arguments, the Court briefly describes Kimmons's various theories of liability and burden-shifting frameworks applicable to Kimmons's ADA and ORA claims.

### 1.        Theories of Liability

Kimmons's ADA and ORA claims against First Transit are premised on four theories of liability: (1) disparate treatment (disability discrimination), (2) failure to accommodate and engage in the interactive process, (3) hostile work environment, and (4) retaliation. (*See* Compl. ¶¶ 65-66, 91-92.)

The Ninth Circuit has recognized these potential theories of liability under the ADA. *See Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 853 n.3 (9th Cir. 2016) (construing the complaint as asserting "four theories of liability under the ADA: disparate treatment (disability discrimination), failure to accommodate, retaliation, and hostile work environment"); *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (observing that the "ADA treats the failure to provide a reasonable accommodation as an act of discrimination"); *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (addressing discrimination and retaliation claims, which were respectively based on the plaintiff's allegations that the defendant "discriminated against him by firing him because of his hearing impairment" and "fired him in retaliation for his filing an [administrative] complaint and requesting an accommodation"). The Ninth Circuit, however, has not resolved whether disability-based hostile work environment claims are actionable under the ADA. *See McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 916 (9th Cir. 2020) ("[W]e have not resolved the issue, [but] every circuit to have done so has concluded that disability-based claims for hostile work environment are actionable under the ADA. . . . We need not resolve that question here, but the weight of authority supports the conclusion that a hypothetical plaintiff could bring essentially the same claim in different circumstances.");

*Denning v. Cnty. of Washoe*, 799 F. App'x 547, 547-48 (9th Cir. 2020) (assuming, without deciding, that "hostile work environment claims are cognizable under the ADA"); *Mulligan v. Lipnic*, 734 F. App'x 397, 400-01 (9th Cir. 2018) (same). The Ninth Circuit has also explained that "there exists no stand-alone claim for failing to engage in the interactive process[;] [r]ather, discrimination results from denying an available and reasonable accommodation." *Snapp*, 889 F.3d at 1095.

To the extent necessary below, the Court separately addresses Kimmons's ADA and ORA discrimination and ADA retaliation theories of liability, and describes how the legal standards and/or burden-shifting frameworks differ. Notably, however, there is no dispute that the Court may (and therefore does) address Kimmons's ADA and ORA discrimination claims together. *See Kelly*, 848 F. App'x at 694 n.1 (discussing the plaintiff's "ADA and ORA claims together" because "[c]laims under the ORA are evaluated using the same legal standard as the federal ADA" (citing *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001))).

## 2.    Burden-Shifting Framework

As the parties agree (*see* Def.'s Mot. at 21; Pl.'s Resp. at 27, 33-34), the Court must analyze Kimmons's ADA and ORA claims under the familiar *McDonnell Douglas* burden-shifting framework. *See Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 943-44 (9th Cir. 2015) (stating that the Ninth Circuit applies the *McDonnell Douglas* framework to claims under the ADA and "Oregon disability law"); *Curley*, 772 F.3d at 632 (stating that "[d]iscrimination and retaliation claims under the ADA are both subject to the burden-shifting framework outlined in *McDonnell Douglas*").[19]

---

[19] Kimmons notes that the framework differs in the reasonable accommodation context. (*See* Pl.'s Resp. at 33-34.) The Court agrees, and addresses and describes that framework

Under this framework, the employee bears "the initial burden of establishing a prima facie case of discrimination (or retaliation)." *Curley*, 772 F.3d at 632; *McDonald v. Molina Healthcare of Wash.*, No. 22-35108, 2023 WL 2387586, at *1 (9th Cir. Mar. 7, 2023) (stating that "[w]ithout direct proof, a plaintiff has the initial burden of showing a prima facie case of discrimination or retaliation" (citing *Curley*, 772 F.3d at 632)). If the employee meets his burden of establishing a prima facie case of discrimination or retaliation, "[t]he burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action." *Curley*, 772 F.3d at 632. If the employer does so, "then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Id.* (citations omitted).

### 3.    ADA and ORA Discrimination

#### a.    Prima Facie Case of Discrimination

To meet his prima facie burden, Kimmons "must establish that: (1) he is disabled within the meaning of the ADA; (2) he is qualified (i.e., able to perform the essential functions of the job with or without reasonable accommodation); and (3) the employer terminated him because of his disability." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 433 (9th Cir. 2018) (citing *Snead*, 237 F.3d at 1087). First Transit moves for summary judgment on Kimmons's ADA and ORA discrimination claims on the ground Kimmons cannot satisfy his burden on the second element. (*See* Def.'s Mot. at 19, 22-24, disputing whether Kimmons can demonstrate that he was a qualified individual, noting that there is no dispute that Kimmons satisfies the first element of his

---

separately below. *See, e.g.*, *Snapp*, 889 F.3d at 1095-96, 1101 (stating that "[i]n general, in the summary-judgment context, a burden-shifting framework applies to the analysis of ADA reasonable-accommodation claims," and describing the comparable but different framework in that context).

prima facie case, and then focusing on First Transit's burden under the *McDonnell Douglas* framework).

First Transit argues that Kimmons is not a qualified individual because the ability to pass a DOT physical is an essential function of Kimmons's job and Kimmons's "CHF prevents him from meeting DOT's physical standards, as Dr. Singh twice explained to him." (Def.'s Mot. at 23.) The Court finds that First Transit fails to demonstrate that it is entitled to summary judgment on this ground.

The Ninth Circuit has "recognized that a plaintiff's burden at the prima facie stage is not onerous, . . . and the necessary evidence is minimal." *Wellington v. Lane Cnty.*, 460 F. App'x 690, 692 (9th Cir. 2011) (citing *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010) and *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000)); *see also Kelly*, 848 F. App'x at 694 (referring to "a minimal prima facie case" of ADA retaliation). With that in mind, the Court turns to the pertinent question of whether Kimmons has raised a genuine issue of material fact regarding whether he could pass a DOT physical at the time of his termination. *See Mayo*, 795 F.3d at 944 ("[Plaintiff] cannot show that he was qualified at the time of his discharge."); *see also Lord v. Arizona*, 286 F. App'x 364, 366 (9th Cir. 2008) (holding that the plaintiff "failed to raise a genuine issue of material fact regarding whether she was qualified to perform the essential functions of her position . . . with or without accommodation").

Kimmons has raised a genuine issue of fact with respect to the second element of his prima facie case. A reasonable jury could infer from the record evidence that Kimmons passed the only complete DOT physical he received before First Transit terminated him, and Drs. DeCapua, Strelich, and Myint's opinions demonstrate that Kimmons's CHF diagnosis and

symptoms were not (or at least were no longer) preclusive at the time of his discharge. *See Wellington*, 460 F. App'x at 693 (recognizing the "minimal" and "not onerous" burden at this stage).

The Court also notes that the record includes conflicting evidence regarding when First Transit terminated Kimmons. Sawyer and Moore created a termination profile terminating Kimmons effective March 3, 2020, and Sawyer states that First Transit terminated Kimmons on that same date. (Ridgeway Decl. Ex. B at 52; Sawyer Decl. ¶ 8.) The record, however, also includes a letter from Sawyer to Kimmons stating that Kimmons was "being laid off on a temporary basis effective April 30, 2020," and reflects that Kimmons did not find out that First Transit terminated his employment until May 2020. (Ridgeway Decl. Ex. B at 53; Kimmons ¶ 52.)

Setting aside Dr. DeCapua's opinion and DOT physical, this conflicting record evidence is potentially notable given that (1) Kimmons must show he was qualified "at the time of his discharge," (2) Kimmons began making medication and lifestyle adjustments in 2019, (3) at all relevant times, Kimmons had an EF greater than forty percent (i.e., one of the two criteria Dr. Singh cited), (4) Dr. Singh refers to the need for class I CHF on the NYHA scale as only a "recommendation," and (5) Kimmons's EF was in the normal range by no later than August 6, 2020. (*See* Snyder Decl. Ex. I at 3, citing the DOT "recommendations" of an "EF of greater than 40%" and "no worse than . . . class I" CHF symptoms on the NYHA scale; *id.* Ex. S at 1, noting that Kimmons's August 6, 2020 EKG "show[ed] normalization of his [EF] to 60-65%"; Kimmons Decl. ¶¶ 29, 39, describing Kimmons's medication and lifestyle adjustments as of October 2019; *cf.* Singh Dep. 56:6-15, reflecting Dr. Singh believes that if a CMV driver with CHF has an EF "greater than 40 percent" and class I instead of class II rating, they can drive a

CMV; in other words, Dr. Singh did not suggest that a CHF diagnosis, standing alone, is preclusive).

For these reasons, the Court denies First Transit's motion for summary judgment on Kimmons's ADA and ORA discrimination claims, to the extent First Transit argues that Kimmons cannot show that he was qualified. (*See* Def.'s Reply at 16, arguing that First Transit had to terminate Kimmons because his "CHF disqualified him from driving a CMF" (citing *Cole*, 218 F. Supp. 2d at 356)); *but cf. Cole*, 218 F. Supp. 2d at 356 (showing that unlike this case, there was "no admissible evidence to support [the] plaintiff's theory" of disability discrimination on summary judgment); *see also Norse*, 629 F.3d at 973 ("[The] evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial[.]").

### b.    First Transit's Burden and Pretext

Proceeding on the assumption that Kimmons can meet or has met his prima facie burden, First Transit argues that it is entitled to summary judgment on Kimmons's ADA and ORA discrimination claims because its reason for terminating Kimmons (i.e., he "falsif[ied]" question five on Dr. DeCapua's "DOT long form") was legitimate and nondiscriminatory. (Def.'s Mot. at 24.) First Transit also argues that Kimmons has not offered sufficient evidence of pretext. (Def.'s Reply at 22-23.)

On its face, First Transit's proffered reason for terminating Kimmons seems legitimate and nondiscriminatory. Even assuming First Transit has carried its burden under the *McDonnell Douglas* framework, Kimmons has presented sufficient evidence to create a triable issue of fact regarding whether First Transit's proffered reason for terminating his employment was pretextual.

///

Kimmons's burden on this front is "not great." *See Turner v. Ass'n of Apartment Owners of Wailea Point Vill.*, 739 F. App'x 874, 876 (9th Cir. 2018) ("In rejecting [the plaintiff's] disparate treatment claim, the district court focused on the third *McDonnell Douglas* prong [at the summary judgment stage], finding no evidence of pretext. But [the plaintiff's] burden on this front was not great."). To avoid summary judgment at this step, Kimmons "must only demonstrate that there is a genuine dispute of material fact regarding pretext," and "[t]he amount of evidence required to do so is minimal." *Id.* (quoting *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1127 (9th Cir. 2009)). Consequently, "'any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder,' and '[w]hen [the] evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason.'" *Id.* (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004)).

Kimmons's evidence creates a triable issue of fact as to whether First Transit's reason for terminating him was pretextual. Indeed, Sawyer, who was the primary decision maker, agreed that Kimmons disclosed his CHF on the DOT long form and to Dr. DeCapua. Sawyer also testified that LIFT drivers can choose where they want to go for DOT certification renewals, but did not explain why Kimmons was not allowed to do that from the outset. Nor did he explain why First Transit departed from its normal practices when Kimmons's cardiologist had already cleared him to work, and First Transit intended Kimmons's October 10, 2019 visit to cover renewal of his DOT medical certification. Also noteworthy is that First Transit's reason for terminating Kimmons depends on what Sawyer claims that Dr. Singh said when Sawyer spoke to Dr. Singh about Dr. DeCapua's records and decision to pass Kimmons. That is significant

because, contrary to Sawyer's testimony, Dr. Singh testified that he did not know and never

spoke to Dr. DeCapua and CHF is not a permanent disqualifier. (*Cf.* Def.'s Reply at 21, arguing

that Sawyer "held a good faith, honest belief that Kimmons falsified" question five on

Dr. DeCapua's DOT long form).

Further, the record reflects that (1) Kimmons received a clearance from his cardiologist

and made medication and lifestyle adjustments and improvements before visiting Dr. DeCapua

and First Transit terminated him, (2) Kimmons had reasonable questions and concerns about the

nature and extent of his heart condition and Dr. Singh's reliability and impartiality, and (3)  not

long before Kimmons's termination, Hoeft discovered a previously absent disciplinary warning

in Kimmons's file and no correspondence between First Transit and Dr. Singh regarding

Dr. DeCapua.

Under these circumstances, summary judgment is inappropriate. *See Curley*, 772 F.3d at

631-33 (noting that the defendant "put forward" several reasons in support of its decision and

explanation as to why it terminated the plaintiff, and stating that although courts "must consider

whether a genuine issue exists with respect to the credibility of each of the employer's proffered

explanations," the plaintiff "[d]isput[ed] only one of [those] well-supported, independently

sufficient reasons for termination[, which] is generally not enough to defeat summary judgment"

(quoting *Cotton v. City of Alameda*, 812 F.2d 1245, 1248 (9th Cir.1987))); *Kelly*, 848 F. App'x at

693-94 (affirming the district court's grant of summary judgment in favor of the employer on the

plaintiff's ADA discrimination claims and noting that the plaintiff "did not put forth any direct or

circumstantial evidence demonstrating that [the employer's] nondiscriminatory reason was

pretextual").

///

c.        **Failure to Accommodate**

Kimmons also alleges ADA and ORA discrimination based on First Transit's alleged failure to provide a reasonable accommodation and engage in the interactive process. (Compl. ¶¶ 65-66, 91-92.)

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Kelly*, 848 F. App'x at 694 (quoting *Snapp*, 889 F.3d at 1095); *see also Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 798-99 (9th Cir. 2017) (explaining that the Ninth Circuit has "recognized that a failure-to-accommodate claim is analytically distinct from a claim of disparate treatment or impact under the ADA") (simplified). The ADA "places on the employer the burden to demonstrate an undue hardship." *Snapp*, 889 F.3d at 1095.

It is well settled that "notifying an employer of a need for an accommodation triggers a duty to engage in an interactive process through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Id.* (simplified). Assuming "an employer receives notice and fails to engage in the interactive process in good faith, the employer will face liability '*if a reasonable accommodation would have been possible*.'" *Id.* (citation omitted). Given "the importance of the interactive process, the Ninth Circuit [has] held that if an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Id.*

///

First Transit argues Kimmons "never identifies the reasonable accommodation he claims he sought." (Def.'s Mot. at 19.) First Transit adds that "[t]o the extent Kimmons claims that he sought to be returned to his Bus Operator job, that request is not reasonable and, in fact, would have violated DOT regulations," because "there is no reasonable accommodation that would allow an individual to bypass DOT regulations[.]" (*Id.* at 23.) Ultimately, though, First Transit's motion for summary judgment on any failure to accommodate theory depends on its argument that Kimmons was not a qualified individual with a disability, which turns on issues of fact. (*See id.* at 22-24.)

In its reply, First Transit does not dispute that it received notice of Kimmons's need for an accommodation and suggests that no reasonable accommodation would have been possible or avoided an undue hardship. (Def.'s Reply at 23-24.) Notably, however, Kimmons's condition worsened after, and stemmed in part from, Sawyer's suggestion that Kimmons should cut back on his diuretic medications, Kimmons's condition was not permanent and did not necessarily preclude CMV driving, Kimmons notified First Transit about his condition, treatment, and medical visits and clearances, Kimmons returned to work, received clearance from his cardiologist, and passed a DOT physical in 2019, and Kimmons improved before and after Sawyer terminated him.

Under these circumstances, and setting aside any potential issue of fact as to whether Kimmons was already able to perform the essential functions of his job in 2019, *see Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993) (stating that "employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job"), the record suggests that a reasonable accommodation may have been possible here. *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135-36 (9th Cir. 2001) ("We have held that

where a leave of absence would reasonably accommodate an employee's disability and permit

him, upon his return, to perform the essential functions of the job, that employee is otherwise

qualified under the ADA."); *see also Hannah v. United Parcel Servs., Inc.*, 72 F.4th 630, 636-37

(4th Cir. 2023) ("[A] period of unpaid leave . . . may be reasonable where the disability that

interferes with an employee's capacity to [perform the essential functions] is temporary and there

is reason to believe that a leave of absence will provide a period during which the employee will

be able to recover and return to work." (citing, *inter alia*, *Humphrey*, 239 F.3d at 1135-36));

*Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 676 (10th Cir. 2021) (noting that reasonable

accommodations can include "sufficient time to recover" and perform the essential functions "in

the near future").

      The accommodation of time to recover might have avoided the hardship First Transit

claims (*see* Def.'s Reply at 24, "[T]he hardship is clear: reinstating Kimmons [post-Dr. Singh's

decision] would have meant violating federal law and putting the safety of its passengers at

risk."), and ensured "accommodation by reinstatement." *See Henneman v. Kitsap Cnty.*, 783 F.

App'x 723, 725 (9th Cir. 2019) (addressing and entertaining a theory of "accommodation by

reinstatement"); *see also Kachur v. NAV-LVH, LLC*, 817 F. App'x 359, 362 (9th Cir. 2020)

(remanding for the district court to determine whether "there are genuine issues of material fact

related to whether [the plaintiff's] request for an extension of his unpaid leave was a reasonable

accommodation," and additional leave "would have posed an 'undue hardship' on [the

defendant]").

      For these reasons, the Court denies First Transit's motion for summary judgment on

Kimmons's claim that First Transit failed to accommodate him and engage in the interactive

process.[20] *See Henneman*, 783 F. App'x at 725 (affirming the grant of summary judgment in favor of the former employer on the plaintiff's ADA failure to accommodation claim "relate[d] to the [employer's] decision not to reinstate [the plaintiff]," and explaining that although the "duty to accommodate is a continuing duty that is not exhausted by one effort," the plaintiff had "already submitted his retirement notice, and the [employer] had accepted it," before he "requested that the [employer] reinstate him" and "accommodation by reinstatement after voluntary retirement was not required by the ADA") (citation omitted); *see also Turner*, 739 F. App'x at 876 (finding a material issue of fact on the plaintiff's failure to accommodate claim and noting that "an employer can violate 'its duty regarding the mandatory interactive process' by failing to explore other possible accommodations once it becomes aware that [any] current accommodations [we]re ineffective" (quoting *Humphrey*, 239 F.3d at 1139)).

### d.    Hostile Work Environment

Kimmons also premises his discrimination claims on a hostile work environment theory. (Compl. ¶¶ 65, 91.) In its motion, First Transit argues that Kimmons's complaint and deposition do not include facts that would "support a claim that anyone at [First Transit] harasses him because of his CHF." (Def.'s Mot. at 19 n.8.) Kimmons did not respond to First Transit's argument or specifically address the nature of or facts that support his hostile work environment theory. Further, neither party addresses whether a hostile work environment claim is viable under the ADA.

///

---

[20] The Court does not consider a failure to accommodate theory based on the 2017 bathroom break accommodation issue (*see* Pl.'s Resp. at 36-37), because the complaint does not suggest that Kimmons was pursuing this theory or provided adequate notice. (*See* Compl. ¶¶ 13-14, discussing breaks and the lack of discipline or warning for the bus incident, and referring to Christiansen's case and generally to how LIFT "drivers were . . . denied breaks and bathroom opportunities").

The Ninth Circuit has seemingly endorsed, but not resolved, whether a disability-based claim for hostile work environment is actionable under the ADA. *See McIntyre*, 976 F.3d at 916 (finding it unnecessary to address the unresolved issue and stating that "every circuit [that resolved the issue] has concluded that disability-based claims for hostile work environment are actionable under the ADA," and the "weight of authority support[ed] the conclusion that a hypothetical plaintiff [in this circuit] could [have brought] essentially the same claim in different circumstances"). Without any helpful or specific guidance from Kimmons, it is unclear if Kimmons's disability-based hostile work environment claim is viable or consistent with circuit caselaw.

In the past, the Ninth Circuit has stated that mistreatment on the basis of a disability, unfair treatment, and isolated derogatory or offensive remarks about a disability are insufficient, and looked for evidence of "severe or persuasive" or "extreme" harassment, which created an "abusive" work environment or atmosphere and altered the conditions of employment. *See Denning*, 799 F. App'x at 547-48 (noting that even if the plaintiff's supervisor "mistreated her on the basis of her disability, [the] conduct was not 'severe or pervasive enough' to create a hostile work environment," and stating that the supervisor's "two derogatory statements about her disability over a three-year period" fell "short of the 'extreme' behavior required for a hostile work environment claim," and "evidence of 'isolated offensive remarks' and instances of 'unfair treatment' are insufficient to support a hostile work environment claim") (citations omitted); *Mulligan*, 734 F. App'x at 400-01 (stating that the plaintiff could not "establish a pervasive or severe atmosphere sufficient to constitute an actionable hostile work environment claim," and noting that for "harassment to be actionable, it must be sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment")
(citation omitted).

The record does not suggest that First Transit subjected Kimmons to severe, persuasive,
or extreme harassment or derogatory remarks about his disability, which created an abusive work
environment or atmosphere. Kimmons spent most of the relevant time period outside the work
environment, and the offensive remarks at issue seem limited to Kimmons's two meetings with
Sawyer and Hoeft and Sawyer's statements and threats about Kimmons's conduct, not any
disability. For these reasons, the Court grants First Transit's motion for summary judgment, to
the extent that it argues Kimmons's evidence is insufficient to support a disability-based hostile
work environment theory.

### 4. ADA Retaliation

Kimmons brings a retaliation claim against First Transit under Title I of the ADA.
(Compl. ¶¶ 78-87.) Kimmons seeks compensatory money damages and equitable relief. (*Id.*
¶¶ 80-84.)

### a. Available Remedies and Standing

The district court's recent decision in *Hanson v. Oregon, Legislative Assembly*, No. 3:21-
cv-780-SI, 2023 WL 22196, at *12-13 (D. Or. Jan. 3, 2023), is instructive here. In that case, the
plaintiff filed a Title I ADA retaliation claim against, among others, her former employer. *Id.* at
*1, *12. The district court declined to reach the merits of the employer's motion for summary
judgment, explained that the plaintiff only requested compensatory money damages, which were
not available under Ninth Circuit precedent, and therefore dismissed the retaliation claim sua
sponte:

> The Court need not reach the merits of the Legislature's motion [for
> summary judgment] against Hanson's retaliation claims. Hanson brings her ADA
> claim under Title I. In *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261 (9th Cir.

2009), the Ninth Circuit analyzed retaliation claims against an employer under Title I, with the remedies available under 42 U.S.C. § 12117 (the remedy clause for Title I). The Ninth Circuit held that Title I ADA retaliation claims 'are redressable only by equitable relief' and thus that 'no jury trial is available.' *Id.* at 1269-70. The Supreme Court has addressed claims under Title II of the ADA (and its remedy clause, 42 U.S.C. § 12133), concluding that although money damages are available under those provisions, punitive damages are not. *Barnes v. Gorman*, 536 U.S. 181, 185, 188 (2002). The Ninth Circuit, however, has held that 'Congress did not intend for Title II to apply to employment' because '[o]btaining or retaining a job is not the receipt of services, nor is employment a program or activity provided by a public entity.' *Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169, 1176 (9th Cir. 1999) (cleaned up). Thus, Hanson's retaliation claim is governed by *Alvarado*, and she may not seek money damages and is not entitled to a jury trial for this claim.

Hanson requests only compensatory money damages as relief for her retaliation claims under the ADA and Oregon law. This relief is unavailable to Hanson under Ninth Circuit precedent. Although neither party raised this issue, a court may dismiss claims sua sponte for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987). The Court dismisses Hanson's ADA retaliation claims because she seeks only money damages.

*Id.* at *12-13 (footnote omitted). The district court added that "a plaintiff also must have standing to assert any appropriate equitable relief," and the Ninth Circuit has "reject[ed] [the notion that] a former employee had standing to seek equitable relief such as requiring anti-discriminatory policies." *Id.* at *12 n.7 (citing *Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1036-37 (9th Cir. 2006)).

Similar to *Hanson*, Kimmons is a former employee who asserts a retaliation claim under Title I of the ADA, and seeks compensatory money damages, as well as equitable relief. (Compl. ¶¶ 78-87.) Consistent with *Hanson* and the Ninth Circuit precedent cited and discussed therein, and to the extent Kimmons seeks compensatory money damages, the Court dismisses Kimmons's retaliation claim sua sponte for failure to state a claim. *See Alvarado*, 588 F.3d at 1262-63, 1270 (addressing a former employee's retaliation claim under Title I of the ADA and

holding that "ADA retaliation claims are redressable only by equitable relief, [and] no jury trial is available").

To the extent Kimmons seeks equitable relief, however, it appears that Kimmons, a former employee who seeks reinstatement (*see* Compl. ¶ 81), has standing to pursue a retaliation claim under Title I of the ADA. *See Walsh*, 471 F.3d at 1037 ("There is no indication in the complaint that Walsh has any interest in returning to work for the State or the [State] Department. . . . Some case law in this circuit indicates that a non-employee may have standing to sue for injunctive relief against an employer, but those non-employees were in the process of seeking reinstatement to their former positions, or seeking work from that employer. Walsh, therefore, lacked standing to sue for injunctive relief from which she would not likely benefit.") (citations omitted); *see also Alvarado*, 588 F.3d at 1264, 1270 (holding that Title I ADA retaliation claims are "limited to the equitable relief specified in 42 U.S.C. § 2000e-5(g)(1)," i.e., a Title VII statute that the ADA's anti-retaliation provision indirectly references and that allows "the court [to] enjoin . . . [an] unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement . . . with or without back pay . . . , or any other equitable relief as the court deems appropriate") (citation omitted).

### b.    Merits

First Transit argues that it is entitled to summary judgment on Kimmons's ADA retaliation claim, noting that Kimmons "did not seek any accommodation except to be returned to the bus driver position," and arguing that First Transit has "already shown that Kimmons's termination had nothing to do with any purported request for an accommodation." (Def.'s Reply at 25, citing Def.'s Mot. at 19-25, which addressed Kimmons's other ADA theories of liability). First Transit also argues that Kimmons's ADA retaliation claim fails because he did not seek a

"reasonable accommodation, and federal law precluded [First Transit] from permitting [Kimmons] to work as a bus operator." (Def.'s Mot. at 25.) The Court finds these arguments unpersuasive.

"A prima facie case of retaliation requires a plaintiff to show: (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Kelly*, 848 F. App'x at 694 (citation omitted). Contrary to First Transit's argument, caselaw supports the theory that reinstatement (and relatedly, potential time to recover beforehand) is an accommodation and making such a request can form the basis of an ADA retaliation claim. *See Henneman*, 783 F. App'x at 725 (referring to "accommodation by reinstatement" and an ADA accommodation claim related to the former employer's "decision not to reinstate"); *Curley*, 772 F.3d at 632 (addressing an ADA retaliation claim premised on the plaintiff's allegation that the defendant "fired him in retaliation for his filing an [administrative] complaint and requesting an accommodation").

Kimmons's ADA retaliation claim is subject to the same burden-shifting framework and findings addressed above. *See Curley*, 772 at 632-34 (recognizing as much). For the reasons previously discussed, there are fact issues that preclude summary judgment in First Transit's favor. In addition to the close temporal proximity between Kimmons's protected activities and First Transit's decision not to reinstate and instead terminate him, Kimmons has presented evidence that undermines and potentially refutes First Transit's proffered explanation for its actions. *See id.* (holding that the plaintiff could not "show pretext," and explaining that "[i]t is true that temporal proximity between a protected activity and an adverse employment action can be sufficient evidence of a causal link between the two to support a prima facie showing of retaliation," but the "information revealed by the [defendant's] investigation defeat[ed] any

PAGE 66 – OPINION AND ORDER

causal inference that might otherwise follow from the temporal proximity between his protected

activity and his termination" and thus the timing did "nothing to refute [the defendant's]

legitimate explanations for the adverse employment action, making summary judgment

appropriate").

## V.    ADEA AND STATE COUNTERPART

In his seventh and eighth claims, Kimmons alleges that First Transit discriminated

against him on the basis of his age, in violation of the ADEA and ORS § 659A.030. (Compl.

¶¶ 65-68, 78-79, 91.) Courts have analyzed age discriminations claim under the ADEA and ORS

§ 659A.030 together. *See, e.g.*, *Roy v. Laborer's Local 737*, No. 21-35103, 2021 WL 5985031, at

*1-2 (9th Cir. Dec. 16, 2021) (addressing the claims under the ADEA framework). The Court

does the same here.

"Where there is no direct evidence of discrimination, ADEA claims are governed by the

burden-shifting framework described in *McDonnell Douglas*[.]" *Bellinger v. Coos Bay Sch.*

*Dist.*, 711 F. App'x 398, 399 (9th Cir. 2017). Thus, Kimmons "first must establish a prima facie

case to create a presumption of unlawful discrimination." *Id.* (citations omitted). To do so,

Kimmons must show that: "(1) []he was at least forty years old; (2) []he was performing h[is] job

satisfactorily; (3) discharged; and (4) 'either replaced by [a] substantially younger [employee]

with equal or inferior qualifications or discharged under circumstances otherwise giving rise to

an inference of age discrimination.'" *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1049

(9th Cir. 2012) (quoting *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.

2008)). "An inference of discrimination can be established by 'showing the employer had a

continuing need for [the employees'] skills and services in that their various duties were still

being performed . . . or by showing that others not in their protected class were treated more

favorably.'" *Diaz*, 521 F.3d at 1207 (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)).

First Transit concedes the first and third elements but argues that Kimmons cannot satisfy the second and fourth. (Def.'s Mot. at 26.) As to the second element, First Transit emphasizes that Dr. Singh "disqualified" Kimmons from driving a CMV and, as a consequence, Kimmons was "not qualified to perform his job." (*Id.*) As to the fourth element, First Transit argues that Kimmons has failed to produce evidence establishing an inference of age discrimination. (*Id.* at 26-27.)

Kimmons responds that it is a disputed issue of fact as to whether he could perform his job. (Pl.'s Resp. at 40.) Kimmons also argues that First Transit's treatment of a co-worker, Thomas Rockstead ("Rockstead"), who is Caucasian, "more than a decade younger," in "far worse physical condition" (i.e., Rockstead underwent triple bypass heart surgery and cardiac rehabilitation), and "yet was retained," gives rise to an inference of age discrimination. (*Id.* at 41; Rockstead Decl. ¶¶ 3-7; *see also* Kimmons Dep. 90:1-19, noting that Kimmons testified that he believes that First Transit discriminated against him based on his age because he was "one of the older guys [at First Transit], and [he] kn[e]w that any health problems that [First Transit] became aware of [were] blown out of proportion"; Snyder Decl Ex. N at 3 & Ex. U at 1, demonstrating that Kimmons and Rockstead were nearly seventy and fifty years old, respectively, during the relevant time period).

The Court concludes that First Transit is entitled to summary judgment on Kimmons's age discrimination claims. Kimmons's proffered comparator (Rockstead) has minimal probative value because he was not similarly situated to Kimmons in all material respects. *See Black v. Grant Cnty. Pub. Util. Dist.*, 820 F. App'x 547, 550 (9th Cir. 2020) (affirming the grant of

summary judgment in the former employer's favor and explaining that the plaintiff's "proffered comparators [had] minimal probative value because they [were] not similarly situated to him in all material respects") (simplified); *Bellinger*, 711 F. App'x at 399 (rejecting that the plaintiff was "similarly situated to the [comparators]," and explaining that the plaintiff "failed to establish a prima facie case of age discrimination" because, unlike the comparators, she "lacked" an advanced degree).

The record does not reflect that Rockstead suffered from CHF like Kimmons, and unlike Kimmons, Rockstead underwent corrective surgery. *See Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir. 1990) (noting that the plaintiff "underwent corrective single-artery bypass surgery"). Rockstead also passed his only post-surgery "fitness for duty examination" at Providence. (Rockstead Decl. ¶¶ 3-7.) Additionally, most LIFT drivers at Kimmons's location were "older workers and many suffered from ailments," such as "heart disease and diabetes," and these drivers "routinely" received their DOT "cards despite their serious health conditions[.]" (Hoeft Decl. ¶ 7.)

On this record, First Transit is entitled to summary judgment on Kimmons's age discrimination claims.

## VI.    TITLE VII AND ORS CHAPTER 659A

### A.    Race-Based Discrimination and Retaliation Claims

In his ninth and tenth claims, Kimmons alleges race-based discrimination and retaliation claims against First Transit under Title VII and ORS § 659A.030. (Compl. ¶¶ 117-31.) The Court concludes that First Transit is also entitled to summary judgment on Kimmons's race-based discrimination and retaliation claims, which the Court may address together. *See Cornell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir. 2006) (noting the similar standards).

In support of these claims and his response to First Transit's motion for summary judgment, Kimmons emphasizes that unlike his case, First Transit and Providence allowed Rockstead to return to work despite his health problems, bypass surgery, and hospitalization. (Pl.'s Resp. at 41.) Kimmons does not address, or explain the basis of, his race-based retaliation claims. (*See id.* at 41-42.)

As with his age discrimination claims, Kimmons fails to present sufficient evidence to support his race discrimination claims. *See Anderson v. Fresno Cnty.*, 342 F. App'x 255, 258 (9th Cir. 2009) (holding that the district court did not err in granting summary judgment on race discrimination claim under Title VII and noting, among other things, that a plaintiff failed to show that the non-African American comparators were "similarly situated in all material respects"). Rockstead was not similarly situated to Kimmons in all material respects. Rockstead did not have the same condition, underwent corrective surgery, and passed his only fitness for duty examination at Providence and with an unknown medical examiner. Accordingly, the Court concludes that First Transit is entitled to summary judgment on Kimmons's race discrimination claims.

Kimmons likewise fails to demonstrate that there is a causal link between any race-related protected activity (such as filing a BOLI complaint) and an adverse employment action. (*See* Sawyer Dep. 67:3-10, showing that Sawyer testified that he was not aware of the BOLI complaint; Ridgeway Decl. Ex. I at 1-4 noting that BOLI received Kimmons's complaint, which included only a few general references to race discrimination, on February 20, 2020; Snyder Decl. Ex. L at 1-2, showing that on January 23, 2020, Sawyer and others were in the final stages of their deliberation on Kimmons). Thus, First Transit is entitled to summary judgment on Kimmons's race-based retaliation claims. *See Anderson*, 342 F. App'x at 259 ("[Plaintiff] failed

to establish a prima facie case to support the retaliation claims because she introduced insufficient evidence that a 'causal link' between her decision to file [an administrative] charge and the adverse employment actions existed."); *Maner v. Dignity Health*, 9 F.4th 1114, 1127-28 (9th Cir. 2021) (stating that the plaintiff "failed to establish the 'causal connection' element of his retaliation claim" under Title VII, and noting that summary judgment is appropriate when there is a "lack of evidence that [the decision-makers] were aware of the prior protected activity") (citation omitted).

For these reasons, the Court grants First Transit's motion for summary judgment with respect to Kimmons's claims for racial discrimination and retaliation under Title VII and ORS § 659A.030. *See Bellinger*, 711 F. App'x at 399 ("[F]ailure to offer [sufficient] evidence establishing a necessary element of [a] prima facie case will ordinarily be fatal to [the] claim.") (citation omitted).

### B.    Kimmons's Testimony in Christiansen's Case and BOLI Complaint

In his remaining twelfth, thirteenth, and fourteenth claims, Kimmons alleges that First Transit retaliated against him for testifying in Christiansen's civil case against First Transit and filing a BOLI complaint. (Compl. ¶¶ 143-70.) Kimmons's twelfth and fourteenth claims, which allege violations of Title VII and ORS § 659A.230, respectively, appear to be premised on Kimmons's testimony in Christiansen's case.[21] (*See* Compl. ¶¶ 145, 161, referring to Christiansen's case in the twelfth claim under Title VII and referencing "good faith" testimony "at a civil proceeding" in the fourteenth claim under ORS § 659A.230). Kimmons's thirteenth claim, which alleges a violation of ORS § 659A.030, appears to be based on Kimmons's filing of

---

[21] ORS § 659A.230(1) "provides for four circumstances in which an unlawful employment practice could arise," including "when an employee is discriminated against in his or her employment because . . . the employee . . . has testified in good faith at a civil proceeding[.]" *Roberts v. Or. Mut. Ins. Co.*, 255 P.3d 628, 633 (Or. Ct. App. 2011).

the BOLI complaint. (*See* Compl. ¶ 149, referring to an unlawful discharge for "fil[ing] a complaint").

      Kimmons's thirteenth claim fails for the reasons discussed. He fails to present sufficient evidence of a causal link between his discharge and the filing of his BOLI complaint, or that any decision-maker even knew that he had filed the complaint. Further, Kimmons's response brief fails adequately to address or argue in support of a claim based on his BOLI complaint. Accordingly, the Court grants First Transit's motion for summary judgment on Kimmons's thirteenth claim.

      With respect to Kimmons's claims based on his testimony in Christiansen's case, summary judgment is inappropriate. The record reflects that Sawyer, who had previously testified in court proceedings, appeared for his deposition in Christiansen's case before Kimmons did. After Sawyer gave his deposition testimony in Christiansen's case, Kimmons informed Sawyer that he did not want to testify and feared retaliation. Sawyer encouraged Kimmons to "tell the truth," and Kimmons presumably did so. However, given Kimmons's previous bus incident and concerns about Sawyer and Moore's handling of breaks and the subject matter of Christiansen's case against First Transit, Kimmons's "truth" may not been favorable to Sawyer and/or undermined the deposition Sawyer already gave in Christiansen's case. All of this is significant considering that Sawyer claimed that he did not know if Kimmons gave a deposition in Christiansen's case, Sawyer played the primary role in the adverse action and decision-making process that ensued thereafter, Dr. Singh's and Sawyer's stories do not appear to align in notable respects, and Hoeft discovered a previously absent bus incident-related warning in Kimmons's file.

///

Given these facts and contrary to First Transit's argument, a factfinder must assess whether there is a causal link between Kimmons's testimony in Christiansen's case and Sawyer's subsequent actions. (*See* Def.'s Mot. at 31-33, arguing that Kimmons's testimony claims are based only on timing, Kimmons has "not made any connections between" his testimony and subsequent termination, and First Transit would have terminated Kimmons "immediately after" he gave the deposition in Christiansen's case if it wanted to do that). Accordingly, the Court denies First Transit's motion for summary judgment on Kimmons's twelfth and fourteenth claims.

## VII.    EVIDENTIARY OBJECTIONS AND MOTIONS TO STRIKE

First Transit raises numerous evidentiary objections and in turn argues that the Court should strike portions of Kimmons's, Hoeft's, and Rockstead's declarations and Dr. Strelich's November 1, 2022 report, which concerns Kimmons's condition in 2019 and 2020 but post-dates the close of discovery. (*See* Def.'s Reply at 4-7; *see also* Def.'s App. 1 at 1-7, ECF No. 53-1, setting forth First Transit's objections to paragraphs of these declarations and Dr. Strelich's report).

First Transit's objections to Kimmons's, Hoeft's, and Rockstead's declarations are based almost entirely on relevance, lack of personal knowledge, the best evidence rule, hearsay, and argument (i.e., certain matters are "not supported by" the evidence or record, raise "credibility" issues, amount to "pure speculation that cannot defeat summary judgment," etc.). (*See* Def.'s App. 1 at 1-7.)

The Court overrules First Transit's evidentiary objections to Kimmons's, Hoeft's, and Rockstead's declarations and declines separately to address them. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider . . . evidence submitted in an inadmissible form, so long as the underlying

evidence could be provided in an admissible form at trial, such as by live testimony.") (citations omitted); *see also Tijerina v. Alaska Airlines, Inc.*, No. 22-cv-00203, 2023 WL 4280794, at *13 (S.D. Cal. June 28, 2023) (overruling evidentiary objections summarily and collecting cases denying, declining to consider, or overruling evidentiary objections on summary judgment, including relevance, hearsay, lack of foundation, lack of personal knowledge, and the best evidence rule); *Pegatron Tech. Serv., Inc. v. Zurich Am. Ins. Co.*, 377 F. Supp. 3d 1197, 1198 (D. Or. 2019) (declining to "separately address each evidentiary objection" on summary judgment); *Criminal Prods., Inc. v. Behaki*, No. 17-00157-SI, 2018 WL 2875892, at *2 (D. Or. June 11, 2018) ("When evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence.") (simplified); *Cordelia Lighting, Inc. v. Zhejiang Yankon Grp. Co.*, No. 14-00881, 2015 WL 12656241, at *2 (C.D. Cal. Apr. 27, 2015) (declining to address a moving party's remaining "objections" because they amounted to "legal arguments, not evidentiary objections"); *Ambrose v. J.B. Hunt Transp., Inc.*, No. 12-01740-HU, 2014 WL 585376, at *5 (D. Or. Feb. 13, 2014) (explaining that relevancy objections are duplicative of the summary judgment standard).

With respect to Dr. Strelich's report, the Court overrules as moot First Transit's evidentiary objection because it is not material to the Court's opinion and Kimmons could present the same information in a different and admissible form at trial. *See Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1088-89 (D. Or. 2012) ("[A]ny necessary rulings on Kaiser's evidentiary objections should be denied as moot, because the evidence moved against does not change the recommendation that Kaiser's motions . . . should be granted.").

The remaining issue to address is Kimmons's motion to strike the declaration of First Transit's human resource manager, Lorie Biggs ("Biggs"), on the ground that First Transit did not list Biggs as a person it believed had "knowledge of the facts concerning the claims or defenses at issue[.]" (Pl.'s Resp. at 1.) Kimmons did not satisfy this Court's conferral requirement with respect to his motion to strike, and both parties supplemented their initial disclosures in December 2022 and after the close of discovery (i.e., First Transit identified Biggs as a potential witness and Kimmons identified Brown). (*See* Crowhurst Decl. ¶¶ 2-3; *id.* Exs. 1-2.) Accordingly, the Court denies Kimmons's motion to strike Biggs's declarations and exhibits.

## CONCLUSION

For the reasons stated, the Court grants in part and denies in part First Transit's motion for summary judgment (ECF No. 28).

**IT IS SO ORDERED.**

DATED this 8th day of September, 2023.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge